**BOARD OF REGENTS OF the UNIVERSITY OF OKLAHOMA, and the University of Georgia Athletic Association, Plaintiffs,**

v.

**NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, Defendant.**

**Civ. No. 81–1209–BU.**

United States District Court,
W. D. Oklahoma.

Sept. 15, 1982.

1278

Andy Coats, Clyde A. Muchmore, Oklahoma City, Okl., Stanley M. Ward, Norman, Okl., for plaintiffs.

Robert H. Harry, Denver, Colo., James D. Fellers, Oklahoma City, Okl., Richard K. Andrews, George H. Gangwere, Kansas City, Mo., for defendant.

MEMORANDUM OPINION

BURCIAGA, District Judge, Sitting by Designation.

THIS MATTER came on for trial to the Court on the merits on June 7 through 15, 1982. At issue is the legality of the controls exercised by the National Collegiate Athletic Association over the televising of college football games. The plaintiffs, both members of NCAA, allege that these controls violate the Sherman Antitrust Act, 15 U.S.C. §§ 1–2 (1980). Having considered the pleadings, evidence, briefs and memoranda submitted by the parties, the Court holds as follows:

(1) The television football controls exercised by NCAA constitute an horizontal

agreement among competitors to fix prices and restrict output, in violation of 15 U.S.C. § 1;

(2) The controls constitute a group boycott, in violation of 15 U.S.C. § 1;

(3) The NCAA exercises monopoly power over the market of college football television, in violation of 15 U.S.C. § 2; and

(4) The plaintiffs are entitled to injunctive relief under the Clayton Act, 15 U.S.C. § 26 (1980).

This memorandum opinion shall constitute the Court's findings of fact and conclusions of law.

## I. Findings of Fact

The parties to this case are the Board of Regents of the University of Oklahoma, the University of Georgia Athletic Association, and the National Collegiate Athletic Association. Plaintiff Board of Regents of the University of Oklahoma [hereinafter, "Oklahoma"] is the governing body of the University of Oklahoma. The Board is responsible for all of the operations of the University, including its intercollegiate athletic program. Oklahoma is a member in good standing of the National Collegiate Athletic Association, the defendant herein.

Plaintiff University of Georgia Athletic Association is a non-profit corporation created under the laws of the State of Georgia. The Association has the responsibility of operating the intercollegiate athletic program of the University of Georgia. The University of Georgia is a member in good standing of the National Collegiate Athletic Association. The executive personnel of the University and the Athletic Association overlap. They shall be collectively referred to herein as "Georgia."

Defendant National Collegiate Athletic Association [hereinafter, "NCAA"] is a private non-profit association organized in 1905. NCAA consists of approximately 900 members. Membership is open to four-year institutions which meet certain academic standards. Allied and Associate membership is open to athletic conferences, associations and other groups interested in intercollegiate athletics.

Oklahoma's intercollegiate football program has, over the years, produced many outstanding and highly-ranked teams. Oklahoma is capable of attracting large national television audiences for its televised games. Football is the only sport sponsored by Oklahoma which actually generates revenue beyond the costs of fielding a team. The profits generated by the football team support all of the other sixteen men's and women's sports in which Oklahoma participates. In recent years, these programs have become more and more expensive to maintain due to increasing costs and the expansion of athletic programs for women. As a result, Oklahoma seeks to maximize its revenues from football television. Like Oklahoma, Georgia has compiled a record of outstanding success with its intercollegiate football program, and football is the major revenue-producing sport for Georgia. Budgetary pressures have forced cuts in Georgia's athletic program, including the elimination of its intercollegiate wrestling program. Georgia also seeks to maximize the revenues generated from the televising of its football games.

It is useful to present as background the history of NCAA and the football television controls it exercises. NCAA operates pursuant to a Constitution and Bylaws adopted by the membership and subject to amendment by the members. The Constitution, Bylaws, Executive Regulations and Official Interpretations are published in a printed manual and distributed to all members. The general policies of NCAA are established by the membership at annual conventions. When the annual convention is not in session, policy is established and directed by the NCAA Council of 22 members elected by the entire membership at the annual convention. NCAA has a professional staff located at its headquarters in Shawnee Mission, Kansas. Some 80 employees execute NCAA policy under the supervision of Executive Director Walter Byers.

NCAA controls all forms of televising of football games of member institutions during the fall football season. NCAA has exercised such control since the early 1950's.

When television first became a significant part of America's entertainment industry in the late 1940's and early 1950's, there were no controls on college football television. Each college was free to make its own contracts with television networks and stations without limitation. The University of Pennsylvania, for example, was televising all of its home football games in the Philadelphia area during this time. NCAA members expressed concerns to NCAA that unlimited telecasting of college football games might be detrimental in a number of ways. Chief among their concerns was the belief that uncontrolled televising of games would result in a decrease of live attendance at other games being played at the same time and in the same geographic area as the televised games being aired.

The NCAA appointed a Football Television Committee to study and report on these concerns. The Committee retained the services of the National Opinion Research Center [hereinafter, "N.O.R.C."] at the University of Chicago. Beginning in 1952, N.O.R.C. conducted a series of studies of the effects of televised college football on gate attendance of college football games. These studies were conducted through 1957, and tended to support the notion that televised college football resulted in a decrease in live gate attendance for the teams which were not being televised. On the basis of the first of these annual studies, the NCAA instituted the first controls on football television in 1953.

Based on the N.O.R.C. studies, the Football Television Committee developed a program of controls. These controls included provisions that television exposures would be limited to one college football game per week on Saturday afternoons during the fall season, that no team would appear on television more than once per season, that the sponsors would select the games to be televised and that the revenues would be divided among the teams playing the game and the NCAA.

From their inception, these controls were approved by a vote of the entire membership of the NCAA, including a good many members which did not even field a football team. Of some 800 voting members, less than 500 are schools which play football. Of these 500, only 187 are Division I schools. Schools in Division I dominate college football television.

The NCAA Television Committee periodically circulated a questionnaire to NCAA members in order to obtain their suggestions as to what types of controls were desirable. A Plan was then developed by the Committee based on the desires of the membership as expressed in the responses to the questionnaires. The proposed Plan was then submitted to the membership for a vote by means of a mail referendum. Once approved, the Plan formed the basis for NCAA's negotiations with the various networks. From 1952 until 1977, NCAA followed essentially the same procedure in contracting with the networks for the right to televise the football games of NCAA members. Beginning in 1977, the membership did not vote on the actual Plan. Instead, a number of "Principles of Negotiation" were distributed to and voted upon by the membership. While these "Principles" provided a general basis from which NCAA proceeded to negotiate with the networks, the evidence shows that substantial departures from these "Principles" have occurred without any form of prior approval by the membership.

Until 1982, the contracts were always made with a single network, although all three of the major networks competed for the rights, and each has held those rights at one time or another. The length of the contracts was always either one or two years until 1977, when NCAA contracted with American Broadcasting Companies [hereinafter, "ABC"] for a four-year term covering the 1978 to 1981 seasons. ABC

held the exclusive right to broadcast NCAA football at the network level from the year 1965 to 1981.

The basic concepts of the original controls have survived to the present. The Plan is reviewed and changes in the Plan are made periodically to reflect the concerns of the membership. The most recent significant changes include:

(1) Contracts with two national networks instead of only one beginning in 1982;

(2) A supplementary series of games on cable television beginning in 1982;

(3) Continuing increases in the number of games to be televised each season;

(4) Continuing increases in the number of times any one school can appear during a given season;

(5) Development of regional, as opposed to national, telecasts; and

(6) Increased televising of games where circumstances warrant "exceptions" to the basic plan for a series of network telecasts.

The Plan allows NCAA members a limited opportunity to televise their games other than on the network which had contracted with the NCAA. An example is the so-called "exception telecast," where a member could obtain special permission from the NCAA to telecast a specific game within a limited area on a local station. Such telecasts are allowed only where no "appreciable damage" would result to schools playing games within the same geographic area and at the same time as the proposed telecast. Local "exception telecasts" bring far less to the schools in terms of rights fees than do network telecasts.

NCAA claims that the controls on college football television are entirely consistent with, and are logical extensions of, the organic documents of the Association. However, before 1971, neither the Constitution nor the Bylaws of the Association made any mention of NCAA control of college football television. Prior to that time, the source of the Television Committee's authority was annual resolutions of the membership. These resolutions were allegedly passed pursuant to a 1952 amendment to the Constitution which added the following provision to the "Purposes" section of the Constitution:

To legislate through bylaws or by resolution of a Convention upon any subjects of general concern to the members in the administration of intercollegiate athletics.

In 1971, NCAA finally added to its Bylaws a statement of its power to control college football television. Bylaw 11–3–(aa) was adopted at that time and reads, in pertinent part:

The [Football Television] Committee shall be responsible for the formulation and administration of the Association's football television policy and program, subject to the approval of the membership.

In addition to the controls exercised by the NCAA over football television, NCAA legislates on a number of other aspects of college football. Playing rules, standards of amateurism, regulation of the recruitment of athletes, standards for academic eligibility, and certification of bowl games involving NCAA members have long been a part of the regulatory scheme developed by NCAA to govern college football. NCAA also regulates other college sports. Significantly, however, football is the only sport in which NCAA has taken unto itself the power to regulate the televising of college athletic events. The schools are free to make whatever arrangements they desire for televising regular season games in all sports except football, subject only to some restraints imposed by the various athletic conferences.

The only other NCAA sport which attracts national television coverage for regular season games is basketball. The NCAA does not control the televising of regular season basketball games. Television arrangements are made by the schools themselves, or by the athletic conferences of which they are members. College basketball games are frequently televised on local

stations and cable networks, in addition to national network broadcasts on weekends. While NCAA argues that the free market situation in television basketball bears no relation to that to be expected in a free market for television football, the Court considers the market in television basketball to be persuasive evidence of how a free market in television football would operate. NCAA's attempt to distinguish basketball from football are unavailing.

Partly out of dissatisfaction with different aspects of the NCAA regulations governing college football, a number of major football conferences and independent schools, all members of NCAA, banded together to form the College Football Association [hereinafter, "CFA"]. Both Oklahoma and Georgia are members of CFA. CFA consists of five of the major football-playing conferences—the Big 8, Southeastern, Southwestern, Atlantic Coast and Western Athletic Conferences—and major football-playing independents such as Notre Dame, Penn State, Pittsburgh, and the service academies. The only major football-playing schools which are not CFA members are the members of the Pacific 10 Conference and the Big 10 Conference. Membership in the CFA is restricted to football-playing schools meeting certain standards of size and importance.

The original purpose of the CFA, which is itself a member of NCAA, was to lobby and promote the interests of major football playing schools within the NCAA structure. Beginning in 1979, however, CFA members began to feel that those colleges with major football programs should have a greater voice in the formulation of football television policy than they had in NCAA. CFA members evidently disliked the fact that all NCAA members had an equal vote on issues involving football television, even though a great many members either did not play football or were otherwise not directly affected by the particulars of the football television contracts.

CFA then began investigating the possibility of negotiating an agreement of its own with the networks for the broadcast rights to games involving CFA members. As a result of these efforts, CFA developed an independent television plan and received a contract offer from the National Broadcasting Company [hereinafter, "NBC"]. This occurred in spite of the ongoing negotiations between NCAA and ABC and Columbia Broadcasting System [hereinafter, "CBS"].

NCAA, having learned of the CFA effort to negotiate football television rights on behalf of its members, was not long in responding. The members of CFA had adopted the position that nothing in the NCAA Constitution or Bylaws empowered NCAA to act as the exclusive bargaining agent on behalf of all of its members for the sale of television rights to college football games. In response to the CFA's activities, the NCAA Council adopted the following "Official Interpretation" of Bylaw 11–3–(aa) on April 18, 1981:

> The Association shall control all forms of televising of the intercollegiate football games of member institutions during the traditional football season as defined in O. I. 307. The terms or principles of the control shall be set forth in a television plan or program which periodically shall be prepared by the Football Television Committee, approved by the NCAA Council for submission to the membership by a mail referendum and approved by at least two-thirds of the members voting, a procedure which has been followed by the NCAA membership on a regular basis for approximately 30 years. Any commitment by a member institution with respect to the televising or cablecasting of its football games in future seasons necessarily would be subject to the terms of the NCAA Football Television Plan applicable to such season.

This broad interpretation of the 1971 amendment was the first clear statement of NCAA's position that membership in NCAA was essentially a grant by the member to NCAA of the right to act as the school's

agent in negotiating football television rights fees. It was also NCAA's first specific statement that it controlled "cablecasting" as well as broadcasting. As if in recognition of this fact, the NCAA leadership proposed an amendment to the Bylaws which reads substantially the same as the "Official Interpretation" quoted above. That amendment was adopted by the NCAA convention in January, 1982. Again, all NCAA members, including many which do not play intercollegiate football, were allowed an equal vote in the adoption of the amendment.

In spite of the NCAA Council's interpretation of the 1971 amendment, CFA continued its efforts to negotiate a separate contract. On June 5, 1981, the CFA adopted its own television plan at its annual convention. CFA members rejected the NCAA's purported right to bargain on their behalf and authorized the CFA administration to seek a separate contract for the television rights to football games involving CFA members. On August 8, 1981, CFA did contract with NBC for the rights to televise the football games of CFA members for the 1982 through 1985 football seasons. The CFA–NBC contract contained the same types of provisions which had long been found in the agreements negotiated by the NCAA. However, the NBC contract would have been more lucrative to the members of the CFA than the current agreements between the NCAA and CBS and ABC. The number of appearances allowed each team per season was more liberal than that allowed by the proposed NCAA contract, and the fees to be paid to participating schools would have resulted in a larger television income per school than the current NCAA contract. This contract was ratified by a vote of CFA members at a special meeting in Atlanta on August 21, 1981. Thirty-three members voted in favor of the contract, 20 voted against, and 8 did not vote. This vote did not make the contract binding, however, because CFA members could still elect to opt out of the contract by written notice to that effect before September 10. After that date, NBC had the right to rescind if any of the CFA members chose to opt out of the agreement.

During the time that the CFA was arranging for the contract and its members were deciding whether to join in the agreement with NBC, high officials of the NCAA were making public statements to the effect that CFA members, if they chose to go with NBC, would be in violation of NCAA rules. Further, it was indicated that the NCAA's retaliation would be swiftly forthcoming. Walter Byers, NCAA's Executive Director, and Thomas Hansen, NCAA's Assistant Executive Director, stated that the NCAA administration would seek expedited disciplinary procedures against offending CFA schools. NCAA President James Frank and the distinguished Professor Charles Alan Wright, Chairman of the NCAA Infractions Committee, made clear that CFA members which chose to be bound by the NBC contract would be in violation of NCAA legislation and that such an infraction was punishable under NCAA's rules. It was also made clear that sanctions would be forthcoming, and would affect not only the football programs of CFA members, but other sports as well.

These events led directly to the initiation of this lawsuit. One reason for the filing of the action was to obtain temporary relief preventing NCAA from initiating disciplinary proceedings or otherwise interfering with CFA's efforts to complete its agreement with NBC. Injunctive relief was granted on September 8, 1981, and has continued in effect to the present.

Although the defendant has complied with the Court's order not to interfere, the plaintiffs and CFA were unable to consummate their agreement with NBC. On the final extended deadline for CFA members to opt out of the NBC contract, few CFA members were willing to commit. Consequently, CFA advised NBC that it was unable to provide an adequate inventory of teams, and the arrangement was terminated. NCAA contends that the CFA schools'

unwillingness to go with the NBC contract was based on sound business considerations. However, the evidence is clear that the threat of NCAA sanctions, ranging from reprimand to expulsion, being imposed at some point in the future was a major consideration in the decisions of many CFA members to opt out of the NBC contract. While we cannot know what factors were telling in the decision of any particular college, it is clear that they were unable to exercise fully independent business judgment due to the threat of NCAA sanctions, in spite of the temporary equitable relief granted in this case.

The dispute between the plaintiffs and the defendant continued both in this Court and in the forums provided by the NCAA. NCAA held two conventions of its entire membership in which a number of the matters raised in this lawsuit were addressed by the membership. A Special Convention was called in December, 1981, at the request of members of the CFA. This Convention was called to deal with restructuring the NCAA. NCAA member schools are divided into several divisions according to the size of the institution and its intercollegiate athletic program. Division I consists of about 275 colleges and universities with major athletic programs. Divisions II and III include some 500 institutions with less extensive athletic programs. Less than 190 of the 275 Division I schools play football. For purposes of football, Division I has been split into two subdivisions, I–A and I–AA. One of the complaints of CFA members was that Division I–A included many schools whose football programs were much less extensive than those of CFA members, most of which are Division I–A schools. Many CFA members believed that their interests and those of schools with relatively minor football programs were not consistent and that Division I should be restructured to reduce the number of schools in Division I–A.

The concerns of the CFA members were addressed at the Special Convention held in December, 1981, though not necessarily to the satisfaction of all involved. Several CFA members had proposed the creation of a new Division IV composed solely of major football-playing institutions. This proposal was ultimately rejected by the NCAA membership. However, another proposal was adopted which reduced the number of schools in Division I–A from 135 to about 95. Notably, most CFA members, including the plaintiffs, favored an even more far-reaching restructuring.

At the Annual Convention held in January, the NCAA membership considered a number of proposals directly relating to football television. Several CFA members proposed resolutions which stated that membership in the NCAA could not be conditioned upon the granting to NCAA of the power to place controls on college football television. This proposal was defeated. Instead, the membership adopted an amendment to the Bylaws which purported to establish the propriety of the NCAA controls, ratified the "Official Interpretation" of the NCAA Council to which the Court has previously referred, and ratified the NCAA's actions concerning televising college football for the 1982 through 1985 seasons. In addition, minor changes were made in the manner in which future television plans for college football would be developed.

Having provided a history of NCAA's activities in marketing football television rights, the Court will now turn to the specific aspects of NCAA's controls. The contracts which were made for the 1978 through 1981 and the 1982 through 1985 seasons are the most relevant to the issues raised herein and will therefore be discussed in detail.

■ One matter must be resolved before examining the controls. The defendant insists that membership in NCAA is voluntary. That being so, says the defendant, the plaintiffs are free to withdraw, thereby ridding themselves of the NCAA controls of which they complain.

It is true that membership is voluntary in the sense that a member institution may withdraw from NCAA at any time. However, it is clear from the evidence that an institution which withdraws or is expelled from the NCAA could no longer operate a fully-rounded intercollegiate athletic program. Non-member institutions could not compete in the prestigious NCAA championship events in such sports as baseball, basketball, track, swimming, wrestling and gymnastics. They would therefore be unable to recruit quality athletes into their programs. Its football team could not play on television against members of the NCAA. As a practical matter, membership in the NCAA is a prerequisite for institutions wishing to sponsor a major, well-rounded athletic program.

Moreover, as shall be discussed below, withdrawal or expulsion from NCAA subjects the non-member to a group boycott, and forces the non-member to attempt to compete against a monopolist. The Court must conclude that NCAA membership is not voluntary for these plaintiffs, or for many other colleges and universities for which athletic excellence is an institutional priority.

Many witnesses offered opinions as to the viability of developing a rival organization to NCAA. The estimates of the number of schools necessary to form a rival group ranged from fifteen to one hundred and fifty. The Court concludes that the formation of a rival organization is neither practical, feasible nor desirable. The Court is persuaded that the number of schools needed to form such a group is prohibitively high. NCAA's functions range from developing the rules of play in college athletics to the sponsoring of national collegiate championships in all major sports except football. NCAA has an annual budget of about $20 million. It maintains a large staff, and an expansive system of committees to carry out its functions. It is clear to the Court that the plaintiffs do not have the option of recruiting schools and forming a rival organization to NCAA.

This conclusion is buttressed by the express desire of both plaintiffs to remain members of NCAA. The defendant suggests that it is disingenuous for the plaintiffs to agree to comply with certain NCAA rules, while challenging other aspects of the NCAA regulatory program in a court of law. NCAA suggests that plaintiffs' motive in bringing this suit is born of spite due to their inability to persuade the NCAA membership that the television controls should be relaxed.

The Court finds little basis to these allegations. The plaintiffs challenge only those aspects of the NCAA regulatory program which they believe violate the antitrust laws and cause them antitrust injury. The plaintiffs make clear that they believe that NCAA has an important role in regulating such matters as the rules of play, standards of amateurism and academic eligibility. For the plaintiffs to support and abide by those aspects of NCAA regulation which do not relate to football television in no way undercuts or shades the merits of their antitrust allegations.

█ Finally, it is suggested that NCAA and college sports generally should be viewed as somehow different; that maximization of revenue introduces an unseemly air of professionalism into college sport and higher education generally. But it is cavil to suggest that college football, or indeed higher education itself, is not a business. The colleges of the nation are in competition for students, for faculty, for government grants, and for philanthropic support. It is a big business and millions of dollars are involved. The same is true of college football. It is a business, and it must behave in a businesslike manner to insure its future viability. The objectives and the past achievements of our institutions of higher learning have earned them great praise and an exalted position in our social fabric. Nonetheless, it is a business and a business operated by professionals. Like any business, the schools which play intercollegiate football seek to maximize reve-

nue and minimize expense while at the same time maintaining the level of quality which makes their product attractive to the buying public. Our society encourages maximization of revenue so long as the means are legal. The Court, therefore, cannot condemn the plaintiffs' desire to maximize revenue. NCAA's suggestion that profit maximization is not a worthy goal is truly disingenuous in light of the fact that the express purpose of NCAA's television controls is to maximize the football revenues of member schools.

Under the NCAA's plan for the 1978 through 1981 seasons, ABC held the exclusive right to televise college football on the network level. For this right, ABC paid a so-called "minimum aggregate fee." A part of this fee, some 8% of the total, went directly to the NCAA to help fund certain of its activities. A specified dollar amount was then reserved for the fee to be paid to the teams participating in NCAA Divisions II and III football championships. Under the terms of its contract, ABC was required to televise these championship contests. The teams which participated in games broadcast by ABC received a fee from ABC for the right to televise those particular games. The remainder of the minimum aggregate fee was divided among the schools which appeared on ABC's weekly college football telecast. In order to comply with the contract, the total of the fees which ABC paid to the teams playing televised games had to equal at least the set minimum aggregate fee for that year, minus that part of the fee going to NCAA and the schools playing in the Division II and III championships.

In essence, ABC was paying a certain sum for the right to be the exclusive carrier of NCAA football on the network level. That sum was divided among the teams which appeared on ABC during the course of any given season. The particulars of how that sum was to be divided among the schools were not spelled out in the contract. However, the NCAA Football Television Committee, throughout the term of the contract, made "recommendations" to ABC as to how much should be paid for each regional telecast, and how much should be paid for each national telecast. ABC always implemented these "recommendations," and at no time did ABC pay any more or any less than the amount "recommended" by NCAA.

Once ABC had decided to televise any particular game, it would notify the host team of its decision. Up through the 1980 season, ABC would send a telegram and "require" confirmation of the school's acceptance of the rights fee which had been established. Beginning in 1981, ABC would only "request" confirmation. However, it is clear that negotiation of the rights fee was not anticipated, nor would it have been tolerated.

For example, in 1978 ABC was obligated under the contract to pay a "minimum aggregate fee" of $29 million. By letter dated April 10, 1978 (Pl. Ex. 18), Thomas Hansen, NCAA's Television Program Director, "suggested" the following distribution of the $29 million. Seven hundred fifty thousand was earmarked for the rights fee to the Division I–A playoffs, and $670,000 for the Division II and III playoffs. Another $165,000 was set aside for regular-season telecasts of Division II and III games. Under the contract, ABC was also awarded the right to televise five NCAA championship events in sports other than basketball and football. Two hundred fifty thousand was set aside for that purpose.

This left a total of $27,165,000. NCAA then took eight percent of this amount as its share, or some $2,173,200. This left $24,991,800 to be divided among the Division I teams appearing on ABC during the 1978 season. Under the contract, ABC was to televise 13 games nationally, and 45 on a regional basis. Mr. Hansen then "worked various combinations" until he reached prices for the regional and national telecasts which, when multiplied by the scheduled number of each type of telecast, equalled the balance of the "minimum aggre-

gate fee." Hansen "recommended" that ABC pay $533,600 for each national game, and $401,222 for each regional game. Multiplying $533,600 by 13 yields $6,936,800, and 45 times $401,222 equals $18,054,990. The sum of these figures is $24,991,790.

This method of determining prices was employed throughout the 1978–1981 sea-sons. The testimony of network officials establishes that for the years 1982–1985, the networks will employ the same method of determining rights fees, and that neither ABC nor CBS will pay any more than the "minimum aggregate fee." (See Table Summary below for key provisions of contracts.)

### TABLE SUMMARY OF NCAA–NETWORK CONTRACTS *

1978–1985

| Year | Number of Exposures | Minimum Aggregate Fee | Total Commercial Minutes | Price per Exposure | Price per Commercial Minute |
|------|------|------|------|------|------|
| 1978 | 23 | $29,000,000 | 506 | $1,260,860 | $57,312 |
| 1979 | 23 | $29,000,000 | 506 | $1,260,860 | $57,312 |
| 1980 | 24 | $31,000,000 | 506 | $1,291,660 | $61,264 |
| 1981 | 24 | $31,000,000 | 506 | $1,291,660 | $61,264 |
| 1982 | 28 | $59,000,000 | 728 | $2,107,140 | $81,043 |
| 1983 | 28 | $64,000,000 | 728 | $2,285,710 | $87,912 |
| 1984 | 28 | $68,500,000 | 728 | $2,446,420 | $94,093 |
| 1985 | 28 | $72,000,000 | 728 | $2,571,420 | $98,901 |

* This Table does not include the contract with TBS for the 1982 and 1983 seasons. The number of exposures, minimum aggregate fee, and total commercial minutes are to be equally divided between ABC and CBS for the 1982–1985 seasons, so that the figure for each network will be one-half of the figure noted in the Table.

Another key feature to the NCAA–ABC contract was a limitation on the number of times any one team could appear on ABC over a certain time period. Under the contract, a school could appear no more than five times over the course of two seasons. A school could televise on stations other than ABC, but only under certain very limited conditions. The "exception telecasts" had to receive prior approval from NCAA. If a school could show that its proposed telecast met all of the prerequisites, NCAA had no discretion as to whether to approve the telecast. A school was allowed to have its game telecast only if all of the tickets for the game had been sold or if the game was to be played more than 400 miles from the school. If these preliminary criteria were met, the school was then required to show that the broadcast would not be shown within a certain distance of any other college football game being played at the same time as the game to be telecast. (For broadcast on a UHF station, the distance limit was 45 miles; for VHF, 120 miles.) The only exception to this rule was that if the other games being played within the distance limitation were sold out, then the broadcast would be allowed. The number of "exception telecasts" has increased over the years. However, many more games would have been broadcast locally were it not for the cumbersome requirements and procedures entailed in applying for an "exception telecast." All of the restrictions noted herein applied only to schools in Division I. Division II and III schools are allowed unlimited freedom in televising their regular season games.

The NCAA makes much of the fact that under the terms of the contract with ABC, member schools were allowed to negotiate with ABC for the rights fee to be paid for any particular game. This so-called right to negotiate was clearly illusory, however. The practical effect of granting exclusive rights to ABC was to create a monopsony; that is, a situation in which there is only one eligible buyer in a product market. The school could not sell the rights to CBS or NBC, unless it was willing to flaunt the NCAA plan. Such a course would violate NCAA rules and subject the school to the disciplinary proceedings which would certainly follow.

As an example, suppose Oklahoma and Georgia had a game scheduled in the fall of 1981. Both teams were highly regarded by the national media, and with their tradition of excellence, the game would have attracted a great deal of national attention. ABC would have undoubtedly wanted to televise this game. If the schools balked at the figure offered by ABC (that is, the figure "recommended" by the NCAA Football Television Committee), ABC had two options. First, ABC could have actually negotiated with the two schools and arrived at a higher figure. Second, and the more likely result, ABC could tell the schools to either take it or leave it. ABC had an almost unlimited choice of other games it could televise in which the teams would accept the fee established by NCAA. The pernicious aspect of the plan was that Oklahoma and Georgia would have no alternatives available to them, save the far less lucrative "exception telecast." ABC would realize that the schools could not sell the rights to another network and, therefore, would be unconcerned about the possibility that the game they ultimately chose to broadcast would appear at the same time another network was broadcasting the Oklahoma-Georgia game.

A clear example of the failure of the rights fees paid to respond to market forces occurred in the fall of 1981. On one week-end of that year, Oklahoma was scheduled to play a football game with the University of Southern California. Both Oklahoma and USC have long had outstanding football programs, and indeed, both teams were ranked among the top five teams in the country by the wire service polls. ABC chose to televise the game along with several others on a regional basis. A game between two schools which are not well-known for their football programs, Citadel and Appalachian State, was carried on four of ABC's local affiliated stations. The USC-Oklahoma contest was carried on over 200 stations. Yet, incredibly, all four of these teams received exactly the same amount of money for the right to televise their games. There is no dispute as to the fact that, but for the NCAA contract, no broadcaster would be willing to pay the same amount for the Citadel-Appalachian State game as they would pay for the USC-Oklahoma matchup. The fees paid were exactly the amount which had been approved by NCAA. Had Oklahoma and USC attempted to negotiate a higher fee, they would have been able to do so only from a position of weakness. Because the schools had lost their right to sell the rights to a competitor of ABC, ABC had little if any incentive to actually negotiate the rights fee. If the schools had refused to accept the price established by NCAA and ABC, they faced the very real and unpleasant prospect of not having the game televised at all. This would have cost the schools both a great amount of money as well as the publicity and prestige which accompanies a network broadcast of a game.

Moving to the contracts which are in effect for the 1982 through 1985 football seasons, there is little indication that the situation will be any different. The new contracts do, for the first time, provide for multiple network broadcasts. Both ABC and CBS now have the right to broadcast NCAA football games. Each network has agreed to pay a minimum aggregate fee of $131,750,000 over the next four years.

In addition to the broadcast network contracts, NCAA entered into a contract with

Turner Broadcasting System, Inc. [hereinafter, "TBS"], for the exclusive live cablecasting of NCAA football games. TBS will pay a minimum aggregate fee of $17,696,000 over the next two years.

NCAA argues that because it invited bids from all three of the major broadcast networks, it has met the Sherman Act's requirement of open competition. However, the evidence supports the opposite conclusion. The fact that both ABC and CBS will pay an identical price for identical packages leads the Court to conclude that there was no true negotiation. NCAA substantially dictated the terms under which both networks could televise NCAA football. The networks were offered a take-it-or-leave-it proposition. A truly free market would not have yielded the identical prices and packages which result from the contracts.

The basic features of the previous plans remain intact. While the contracts themselves appear to provide for competition between the two networks for the right to televise any particular game, the so-called "ground rules" developed by NCAA for the two-network plan eliminate any possibility of competitive bidding between the networks. This much is effectively undisputed. Representatives of the networks and of NCAA have made clear in recent months in their statements to concerned NCAA member schools that competitive bidding for game rights is not contemplated under the new contracts. Instead, the "ground rules" will again produce a monopsony situation in which a single network will have exclusive television rights to any given game.

The "ground rules" will operate in the following way. Before the beginning of each season, the networks will submit to the NCAA Television Committee their preferences for a minimum of three "special dates" per network for the broadcast of football games during that season. If the networks both select the same date, a coin flip will determine which network gets first choice of the "special dates." The network which wins the coin flip would choose a special date, and then the other network would be allowed to select one, with this process continuing until each network has all of the special dates it wishes. The special dates available to the networks are: the first Saturday of the television series for each season; Thanksgiving Day; the Friday and Saturday following Thanksgiving Day; the first Saturday in December; Labor Day; Veterans Day; Monday through Thursday nights, and any Saturday night date approved by the Committee. The networks would then select a date and the specific game or games it wishes to televise, as well as the time of day at which it will show the game. While it is possible for both networks to carry games on the same special date, rules have been developed which will minimize, if not eliminate, the possibility of more than one game being shown at any particular moment.

After the "special dates" have been selected, the networks will then engage in a so-called "equity draft" in which each network will be allowed to select at least two "equity games" for broadcast by that network. Again there is a provision which minimizes the possibility of two games being broadcast at the same time by the two networks.

After the "equity draft," the networks will then begin alternatively selecting dates over which they will have a "right of control," i.e., the first right to choose any given game. If CBS were to select, say, Saturday, October 30, it would have its pick of all of the games being played that day. If a particularly attractive game is scheduled for that day, CBS would have the first right to choose that game for broadcast. Presumably, the schools staging the game could negotiate for more money than CBS is offering, in hopes that the possibility that competitive bidding between the networks would occur. NCAA contends that this possibility cures the alleged illegality of the prior contracts. However, that view is not supported by the evidence. First, the networks have no intention to engage in bid-

ding. Second, once the network holding first choice for any given date has made its choice and agreed to a rights fee for that game with the two teams involved, the other network is then in a monopsony position. The schools cannot threaten to sell the broadcast rights to any other network. They cannot sell to NBC without committing a violation of NCAA rules. They cannot sell to the network which had first choice over that particular date because, again, they would be in violation of NCAA rules, and the network would be in violation of its agreement with NCAA. Thus, NCAA creates a single eligible buyer for the product of all but the two schools selected by the network having first choice. Free market competition is thus destroyed under the new plan. In the words of James Spence of ABC Sports, while it is theoretically possible for the networks to engage in a bidding war for the rights to any particular game, "the system is not set up in that way."

The remaining key features of the new contracts are basically the same as in the past. Each network must broadcast a college football game on at least 14 different dates, and a minimum of 35 games must be shown per year by each network. At least seven of the broadcasts must be national, and a minimum of six must be regional broadcasts. At least one of the networks must broadcast a game on each Saturday of the fall season. No one school can appear any more than six times during any two-year period, and no school can appear nationally more than four times over two years. At least 82 different teams must appear on each network over a two-year period. The number of times any one school may appear during the two-year period must be divided equally between ABC and CBS.

The effect of the NCAA's program of controls is quite obvious. Rather than letting the market operate freely, NCAA has seriously restricted free market forces in the economics of college football television.

Turning first to the plaintiffs' allegations of price-fixing, it can be said with certainty that the prices which have been paid in the past to participating schools for the right to televise any particular game do not even resemble the prices which would have been paid were it not for the NCAA controls. It is quite obvious that were it not for the NCAA controls, no network decisionmaker would even consider offering the same price to the schools involved in last fall's Oklahoma-USC and Citadel-Appalachian State games. Even the defendant's witnesses had to agree that a free market mechanism most certainly would not have resulted in the uniform price paid for each and every game broadcast under past NCAA contracts with the networks. The evidence is clear that NCAA controlled the price to be paid to participating teams, and made it impossible for the teams to negotiate any higher price by restricting dealings to a single network. The evidence is also clear that some teams would have received larger fees were they allowed to negotiate with any and all potential broadcasters. At the same time, the testimony made clear that many of the smaller schools would not have received as much as they did under the NCAA plans if they were forced to compete in a free market.

While the NCAA protests that these features have been eliminated by the new dual-network contracts, it is clear that they have not. As discussed above, a maximum of one game each week may allow the participating schools to engage the networks in true negotiations. However, after the network having the right of first choice on any given date has made its agreement with the teams playing the most attractive game of the week, the other schools are left in the same position as they were under previous contracts. They will be selling in a market where there is only one eligible buyer. They will be unable to use the bargaining leverage which would be available if they could sell the rights to the game to other broadcasters. Further, this monopsony situation is aggravated by the limitations on the number of times a school can appear on a given network over a two-year period.

Suppose Georgia appears on ABC three times during one year, two national broadcasts and one regional. Under the current contracts and the "ground rules" accompanying them, during the following year Georgia could only appear, if at all, on CBS. This is because Georgia is limited to six appearances over a two-year period, and these six are to be equally divided between the networks. During the second year, ABC would not be allowed to televise a Georgia game. Georgia would then be forced to appear only on CBS. Georgia would have no bargaining leverage to negotiate a larger-than-average rights fee, since it could not threaten CBS with selling the rights to ABC. Thus, while the new contracts may appear, at first blush, to alleviate these features of past NCAA contracts, in fact they do not. The setting of a minimum aggregate fee, in combination with the "ground rules" restricting competition between the networks and the limitations on each team's appearances, only perpetuate the monopsony situation which NCAA has created.

■ It was suggested by defense witness Landes that the "minimum aggregate fee" contained in the contracts represent a figure not substantially different from the total of all rights fees which would be paid to colleges in an unrestricted football television market. This testimony fails to persuade the Court that NCAA's controls are not illegal price-fixing for several reasons. First, Dr. Landes' testimony was pure speculation. There is no data whatsoever before the Court in support of this conclusion, and Dr. Landes' guesswork is unpersuasive. Second, even if Dr. Landes' speculation were proven correct, it does not resolve the essence of the plaintiffs' contention that some football games are worth more to broadcasters than others. The example of the rights fees paid for the 1981 Oklahoma-USC and Citadel-Appalachian State games was conceded by Dr. Landes to be a gross distortion of free-market forces. Third, whether or not the price paid by the networks is reasonable is not a permissible inquiry. Even if Dr. Landes were correct about the reasonableness of the price paid by the networks, that does not mean that the NCAA controls are any less offensive to the Sherman Act. *National Society of Professional Engineers v. United States,* 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978).

■ The plaintiff also urges that NCAA has acted to place a horizontal limit on production. That is, by making agreements with the networks for exclusive national television rights and placing severe restrictions on local broadcasts of college football, NCAA has agreed to limit production of televised college football. It is clear from the evidence that were it not for the NCAA controls, many more college football games would be televised. This is particularly true at the local level. Because of NCAA controls, local stations are often unable to televise games which they would like to, even when the games are not being televised at the network level. The circumstances which would allow so-called exception telecasts arise infrequently for many schools, and the evidence is clear that local broadcasts of college football would occur far more frequently were it not for the NCAA controls. This is not a surprising result. Indeed, this horizontal agreement to limit the availability of games to potential broadcasters is the very essence of NCAA's agreements with the networks. The evidence establishes the fact that the networks are actually paying the large fees because the NCAA agrees to limit production. If the NCAA would not agree to limit production, the networks would not pay so large a fee. Because NCAA limits production, the networks need not fear that their broadcasts will have to compete head-to-head with other college football telecasts, either on the other networks or on various local stations. Therefore, the Court concludes that the membership of NCAA has agreed to limit production to a level far below that which would occur in a free market situation.

The evidence is also clear that the NCAA plan has many of the characteristics of a group boycott. There are two different ways in which NCAA's cartel-like behavior works as a group boycott. First, by granting exclusive rights to certain networks for televising college football, the NCAA essentially agrees not to bargain or make its product available to other broadcasters. If an NCAA school were to make an agreement with a broadcaster which did not comport with the NCAA plan, very severe penalties could be inflicted on the offending school under NCAA's rules. Thus, the schools do not stray from NCAA plan, as can be seen from the events which transpired when CFA attempted to negotiate its own contract with NBC. The veiled threats which came from NCAA officials and NCAA's entire course of conduct constituted classic cartel behavior.

This leads directly to the second aspect of the group boycott allegation. If a member school were to defy the NCAA and make its product available to all potential buyers on an equal basis, that school would itself be made subject to a group boycott. This aspect of the group boycott operates in the following way. Unlike many industries, college football requires the cooperation of two producers in order to create their product. That is, two schools must stage a game; one school could not stage a football game by itself, at least not a game which would attract the kind of attention which NCAA football now attracts. If a member school strayed from the NCAA plan, it would be subject to very severe sanctions from the NCAA. Among the sanctions available would be expulsion from NCAA. Since NCAA members are prohibited from playing televised football games with non-NCAA members, the expelled school would be unable to produce its product. Such a situation would clearly constitute an agreement among NCAA members to boycott the school which strays from the NCAA Football Television Plan.

The NCAA offers several justifications for its policies. The principle argument

relied upon by the NCAA is that it is attempting to protect the gate attendance of member institutions. The evidence does not support that contention. First, the Court is not persuaded that college football television has any effect on gate attendance. The N.O.R.C. reports so heavily relied upon by NCAA are fallible in a number of ways. First, their age renders them most suspect. The last of these reports was compiled in 1957, some twenty-five years ago. It strains logic past its breaking point to suggest that because something was true twenty-five years ago, it is still true today, particularly when the subject of discussion is something so fluid as public preference in entertainment. Moreover, the N.O.R.C. studies, while quite professional and thorough, were analyzing a controlled market. Only the first of the N.O.R.C. studies was done in the absence of NCAA controls. The rest were studying a controlled market. No valid conclusion can be reached on the basis of a single year's study, nor on the basis of studies of a controlled market. We simply do not know the effects of uncontrolled televising on gate attendance. Nor is the Court willing to infer deleterious effects from the evidence presented.

The N.O.R.C. studies fail to show that football television was the cause for the steadily declining gate attendance at college football games during the early years of the study. There was no evidence that N.O.R.C. made any attempt to measure the general impact of the rapidly growing television industry (outside of televised football) on gate attendance. The N.O.R.C. study conceded that college enrollment had declined during the same years that gate attendance did, yet tries to minimize the very obvious relationship between declining enrollment and declining gate attendance. In short, because of the N.O.R.C. study's failure to account for the effect of circumstances which logic says would negatively impact college football attendance, and the inadequate data base upon which it relies, the reliability of the conclusions is suspect. Yet the N.O.R.C. studies are the only em-

pirical evidence supporting NCAA's conclusion that football television harms gate attendance.

The study conducted by Dr. Landes and introduced into evidence is equally unpersuasive. While the study purports to analyze the effect of football television on gate attendance in the areas surrounding Oklahoma and Georgia, Dr. Landes was forced to admit that the study was imperfect since there is no weekend in which college football is not being televised nationally. The statistical significance of the correlation between televised football and gate attendance is marginal, and particularly unpersuasive in that it fails to analyze that effect in terms of the time of day in which the televised games are broadcast as opposed to the time at which the other games are being played. Furthermore, like the N.O.R.C. study, Dr. Landes was studying a controlled market.

However, the greatest flaw in the NCAA's argument is that it is manifest that the new plan for football television does not limit televised football in order to protect gate attendance. The evidence shows that under the new plan, many areas of the country will have access to nine hours of college football television on several Saturdays in the coming season. Because the "ground rules" eliminate head-to-head programming, a full nine hours of college football will be shown on television during a nine-to-twelve hour period on almost every Saturday of the football season in most of the major television markets in the country. It can hardly be said that such a plan is devised in order to protect gate attendance.

· In the end, the NCAA's argument regarding gate attendance is either an ill-founded belief at best, or at worst, a deception employed to make the majority of the NCAA membership believe that they should control football television out of self interest. The vast majority of NCAA members suffer none of the restrictions of the NCAA controls, yet that majority can seriously undermine the goals of those schools which are subject to the controls and whose athletic programs are almost completely dependent on revenue from football.

It is also suggested by NCAA that the controls help preserve a competitive balance among the football programs of the various schools. Again, the argument must fail. NCAA has failed to show why this competitive balance cannot be maintained without NCAA acting as the exclusive bargaining agent for its members in matters of football television. Several witnesses testified to a vague belief that the entire program of controls is necessary, but not one witness could give a credible, factually-supported explanation as to why that is so. Even the executive officers of the NCAA could not explain why it is necessary for NCAA to act as the exclusive agent. If the NCAA is seeking to improve the competitive position of smaller schools seeking television revenues, it has done so in a way which inhibits, if not destroys, the effect of free market mechanisms on the price paid to teams appearing on television.

If the NCAA is seeking to improve competition on the football field, it has chosen a much too far-reaching manner of doing so. The NCAA regulations on recruitment, the limitations on the number of scholarships each team may award, and the other standards for preserving amateurism found in NCAA legislation are sufficient to achieve this goal. Rather than relying on the NCAA to improve their competitive position by restraining competition, the schools can and should compete on their own and improve their position in that way.

The plaintiffs' final allegation is that the NCAA exercises monopoly power over college football television. As is often the situation in cases of this type, the most difficult factual inquiry is the definition of a relevant market. This inquiry is made exceedingly difficult in this case by the fact that we cannot know for sure what the characteristics of this market would be if the market were a free one. The NCAA

controls prevent the free market economy from operating as to college football. Because we cannot know what the characteristics of the industry would be in a free market situation, the definition of a relevant market necessarily involves some guesswork.

■ The Court concludes that the relevant market for testing whether the NCAA exercises monopoly power is live college football television. This conclusion is based on the following facts.

■ Defining a relevant market involves inquiries into a number of factors, including such characteristics of the industry as the geographic area in which it is available, the time at which it is available, special characteristics of the buyers and the sellers of the product, and special characteristics of the product itself. The only one of these inquiries as to which there is no dispute is that the geographic market is the United States.

The time at which college football is available is Saturday afternoon. Several facts support this conclusion. The vast majority, some 75%, of intercollegiate football games are played on Saturday afternoon. On Saturdays, college football television is free of competition from the programming which logically is the most substitutable; professional football. By the terms of the antitrust exemption which Congress has granted the National Football League, the professional teams cannot televise their games on Saturday during the college football season. The games to be broadcast are quite clearly a perishable item. Once the game is over and the score of the game is made known to college football fans, viewers are not nearly so likely to watch the game on a delayed telecast basis as they would to watch a live broadcast of the game. Since Saturday afternoons are the time at which most games are played, live broadcasts are almost uniformly on Saturday afternoons. To suggest that college football competes with the complete spectrum of broadcast programming is to ignore the clear fact that Saturday afternoon is the only time at which this perishable product is uniformly available to the broadcaster.

Another factor supporting this conclusion as to the time the product is available is that on Saturday afternoons the type of programming against which the NCAA football telecasts compete is qualitatively different from that available at other times of the week. Network broadcasting on weekdays is characterized by such programming as talk shows, game shows and "soap operas." Weeknight broadcasting is characterized by situation comedies, drama series, and feature movies. The movies which are shown, whether originally made to play in theatres or expressly produced for television, are generally recent works. In contrast, Saturday afternoon programming consists generally of sports programming, cartoons and old movies. It is generally agreed that the quality of Saturday afternoon television, excepting the sports programming, is lower than that offered during other times of the week. So powerful is the appeal of college football on Saturday afternoons that for the past few seasons, the CBS network "went dark" on half of the afternoons on which NCAA football was being shown on ABC. That is, CBS offered no programming at all.

The Court concludes, therefore, that the time at which college football is available is a significant characteristic in defining the relevant market. It is clear from the evidence that college football is uniquely suited to broadcast on Saturday afternoon. The defendant's expert witness on the broadcast industry testified that college football is different from other programming in that it is uniquely available at the only time of the week in which it is able to compete. College football could not compete on weekdays since the majority of the television audience at that time are women and most network programming is aimed at that audience. Similarly, college football

cannot compete with weeknight programming on a consistent basis. It was the opinion of NCAA's expert that college football could not compete even with professional football on Sunday afternoons. Therefore, the conclusion that college football is uniquely suited to broadcast on Saturday afternoons is inescapable.

NCAA urges that even if Saturday afternoons are found to be the time frame by which the relevant market is measured, the Court should consider all Saturdays throughout the calendar year in determining NCAA's market power. However, the Court finds that only the fall football season is relevant. Many products are available only on a seasonal basis, agricultural products being the best example. College football is only played in the fall, and there is no need to look beyond that part of the year.

Turning next to the characteristics of the buyers, there is much disagreement between the parties as to what entities should be considered the buyers in this market. NCAA strenuously argues that the true buyers in the field of network television are the advertisers who buy commercial time during any particular television show. The plaintiffs take an entirely different approach, insisting that the buyers are the networks who purchase the right to televise any particular college football game. The Court believes that the focus of this inquiry must be guided by the nature of the specific antitrust injury alleged by the plaintiffs. The plaintiffs' concerns have little to do with which particular advertisers choose to buy commercial time on college football telecasts. Regardless of which network or networks ultimately buy the package offered by NCAA, there are going to be advertisers who buy commercial time on those broadcasts. The activity which produces injury to the plaintiffs is NCAA's sale to a particular broadcaster or cablecaster of an exclusive right to televise college football games. That being the source of the injury, the Court's analysis must focus on that

transaction. By focusing on that transaction, it becomes clear that college football television is a distinct market in which the stations and networks are the buyers.

Similarly, it is clear that the sellers in this market are the schools whose teams play the games. NCAA insists that the sellers are the networks which sell commercial time to the advertisers. This analysis is flawed for the reasons discussed above. The transaction which is at issue is not the sale of advertising time; it is the sale of the right to broadcast college football games. While in theory each college which plays football should be a seller of the rights to the games which it produces, the theory does not reflect the practice. Under perfect competition, the colleges would all be independent producers competing to sell the broadcast rights to their football games for the highest possible amount. However, NCAA has, by virtue of its controls over football television, literally commandeered this right by acting as the exclusive bargaining agent for the sale of college football television rights. In essence, NCAA has made itself the single seller in the relevant market of college football television, at the expense of the individual sellers.

It is clear that these sellers are unique in the television business. The primary business of these sellers is not television, but education. This fact alone distinguishes these sellers from others. Moreover, there are no other entities which can produce the product. Only the colleges of the nation are able to produce high quality amateur football. High school football does not have the appeal of college football, and is never televised at the network level.

Even if the Court were able to accept the defendant's theory that the buyers in the market are the advertisers and the sellers are the networks, the evidence still persuades the Court that college football is a market unto itself. Advertisers pay far more for commercial time on college football broadcasts than for most other programming—almost three times as much as

is paid for Major League Baseball, for instance, and 2½ times as much per viewer as the average program. College football has far and away the largest share of the Saturday afternoon audience of any regular programming, save the Major League Baseball playoffs and World Series. It is true, in terms of rating points (the percentage of television homes actually watching any particular show) that NCAA football does not match most prime time programming. However, that is clearly a function of the fact that fewer homes generally have the television playing on Saturday afternoons. All of this suggests that the demographics of the audience which watches college football is unique. There is simply no other explanation for the amounts of money which advertisers will spend in order to reach an audience that is small when measured against that which is drawn by prime time programming. This conclusion is strengthened by the fact that certain kinds of advertisers dominate the commercial time in college football telecasts.

There are also unique characteristics of the product itself. As stated by James Spence of ABC Sports, NCAA football is a unique product because of its history and tradition, the color and pageantry of the event, and the interest of college alumni in the football success of their alma mater. It is noteworthy that college graduates have buying power which proportionately far exceeds their number. Indeed, ABC was willing to suffer a net loss in televising college football for the benefits it derived from being affiliated with the sport.

The defendant's theory that the relevant market is all broadcast programming is untenable. College football simply does not compete with shows such as "M*A*S*H," "Dallas" or "Saturday Night Live." Although the demographics of the audience for these shows may be similar to those of the audience for college football, the time at which they are shown is not. "M*A*S*H" is not broadcast on Saturday afternoon, and college football is rarely seen in prime time. Indeed, NCAA restricts prime time broadcasts of college football. "General Hospital" is not shown on Saturday and college football is not shown on weekday afternoons. To accept the defendant's theory of relevant market is to say that every type of programming seen on network television competes with every other type of programming. This is simply not so. Programming patterns vary not only by day of the week, but by the time of day. The audiences for different types of programming have extremely diverse demographic characteristics. The types of advertisers who buy commercial time vary greatly depending on the type of programming. It strains credulity to suggest that broadcast programming does not consist of submarkets, and the Court finds that the evidence does not yield that result.

The evidence is also clear that there is no other product readily substitutable for college football. The most logical substitute, professional football, is not available on Saturday afternoons during the college football season. It is certainly true, as the defendant suggests, that if college football were not available for broadcast, other programming would be substituted. But that simply does not mean that all other television programming is readily substitutable. First, even without NCAA controls, college football would be available to the broadcasters of the nation. The evidence suggesting that college football will not be shown on the network level in the absence of NCAA controls is not credible in the view of the Court. College basketball has done quite well without the interference of NCAA, and there is no reason to believe college football would not.

Second, when college football is available on one network, other networks are hard pressed to find competitive programming other than Major League Baseball. This is evident from the fact that in recent seasons, CBS often "went dark" when ABC was broadcasting college football. Third, both ABC and CBS were willing to pay a

great deal more for the right to broadcast college football for the years 1982 through 1985 than ABC paid for the years 1978 through 1981. While some of the difference is to be expected as a product of inflation, the sums to be paid by CBS and ABC are truly extraordinary. ABC and CBS will pay twice as much between them for a *non-exclusive* right in the years 1982 through 1985 than ABC paid for an *exclusive* right in the years 1978 through 1981. This is an extremely clear indication that, in the view of the networks, there is no product which can be readily substituted for college football.

Similarly, the defendant's evidence showing that television advertisers would, if college football were not televised, find other programming on which to advertise is of little significance. It is certainly true that if there were no NCAA football on television, advertisers would find other programming on which to advertise. It is also true that a relatively small percentage of the total television advertising budgets of advertisers who buy time on NCAA football telecasts is devoted to NCAA football. However, these facts do not compel the conclusion that other television programming is readily substitutable for NCAA football. Advertisers on NCAA football telecasts pay a very large amount to reach a relatively small audience. That audience consists largely of male college graduates between the ages of twenty-five and forty-nine years. The average income and buying power of this audience exceed that of the audience for most television programming. This is an audience for which advertisers are willing to pay a relatively high price. Therefore, the price these advertisers pay, when considered in conjunction with the time of the week at which NCAA football is broadcast, lead the Court to conclude that live college football television is the relevant product market.

NCAA urges that the controls were adopted because of a genuine concern among NCAA members that college foot-

ball television would reduce gate attendance. Therefore, there was no intent to violate the antitrust laws, and there is still no such intent, according to NCAA. However, the Court is persuaded that NCAA has been well aware of the vulnerability of its football controls to attack under the antitrust laws for some time. In 1976, Executive Director Walter Byers admonished a subordinate to not use the word "set" in describing the Television Committee's activities regarding rights fees for individual games. The word "recommended" was substituted. Byers sought to explain his action as an innocent correction of a subordinate's choice of inaccurate language. However, the Court views this incident as an attempt to conceal NCAA's power to fix the price of college football games.

NCAA is not alone in its awareness of the antitrust implications of its football controls. In December of 1978, ABC urged NCAA to seek an antitrust exemption from Congress. NCAA declined, noting that a recent change in the leadership of the Senate Judiciary Committee made it unlikely that such a proposal would be approved by the Committee.

These incidents and others persuade the Court not only that NCAA was aware of the antitrust implications of the football controls, but also that NCAA has attempted to conceal the extent of its anticompetitive activities. Of course, no specific intent is required to find the defendant liable under the antitrust laws, but this knowledge of the defendant's intent is useful in interpreting the facts of this case and predicting the consequences of the controls. *See Chicago Board of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918).

In summary, the Court concludes that the NCAA controls over college football make NCAA a classic cartel. This cartel has an almost absolute control over the supply of college football which is made available to the networks, to television advertisers, and ultimately to the viewing public. Like all

other cartels, NCAA members have sought and achieved a price for their product which is, in most instances, artificially high. The NCAA cartel imposes production limits on its members, and maintains mechanisms for punishing cartel members who seek to stray from these production quotas. The cartel has established a uniform price for the products of each of the member producers, with no regard for the differing quality of these products or the consumer demand for these various products.

Like all cartels, NCAA seeks to regulate the distribution of revenues to the cartel members. The distribution of football television revenues under the NCAA program in no way resembles the distribution to be expected in a free market. Like all cartels, NCAA, the umbrella under which the cartel has formed, takes for itself a sizable cut of the revenues from the cartelized product.

Finally, the internal wranglings among NCAA members strongly resemble classic cartel infighting. The many less prominent schools seek to expand their football revenues beyond what they would receive in a non-cartelized market. As in all cartels, these artificially high revenues must, at some point, be derived at the expense of more prominent cartel members. The NCAA's attempts to placate the prominent producers, such as Georgia and Oklahoma, have failed. These plaintiffs and others whose superior competitive practices have earned them prominence in the sport of college football wish to no longer suffer the economic injury visited upon them by the less prominent members of the cartel.

Most cartels ultimately fall because of a healthy self-interest among the producers whose competitive ability has earned them prominence in the market. The NCAA football television cartel is no different.

## II. Conclusions of Law

### A. Jurisdiction and Venue

The plaintiffs have filed this action pursuant to Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2 (1980). Jurisdiction is proper under 28 U.S.C. § 1337 (1980). Venue is proper for purposes of injunctive relief under 15 U.S.C. § 26 (1980). Venue is proper for purposes of declaratory relief under 28 U.S.C. § 1391(b) (1980), as the plaintiffs' claim arose in this district.

### B. Justiciability

■ The defendant's first set of arguments go to the justiciability of this case. NCAA urges that the plaintiffs lack standing because they have suffered no antitrust injury as required under Section 16 of the Clayton Act, 15 U.S.C. § 26. Moreover, argues the defendant, because a new set of television contracts are in effect for the 1982 through 1985 seasons, any injury the plaintiffs may suffer is purely speculative, and there is no present case or controversy. Both of these arguments lack merit.

It is clear that the plaintiffs have suffered antitrust injury. There can be no doubt that both of these plaintiffs would have realized increased revenues from football television but for the NCAA controls. The fact that ABC paid the same fee for the plaintiffs' games as it did for the less attractive games leads readily to the inference that if the networks were allowed to choose games for broadcast free from the strictures of the NCAA controls, schools such as the plaintiffs would receive larger fees for their games. This is particularly true if the networks are bidding against one another for the right to broadcast any particular game. It is also clear that the plaintiffs would realize more revenue from local and regional broadcasts were it not for the NCAA controls. The plaintiffs have suffered injury directly flowing from NCAA's football television controls.

The injury suffered is personal to the plaintiffs. *See United States v. Borden Co.,* 347 U.S. 514, 74 S.Ct. 703, 98 L.Ed. 903 (1954). This is not a case where the plaintiffs assert that they suffer injury as members of the general public. They are producers in the affected industry. The injury

they suffer is direct and substantial, and not indirect or derivative of injury alleged to have been suffered by the public at large.

Even if the plaintiffs had not yet suffered antitrust injury, they have clearly established the prospect of threatened future injury.

> Section 16 of the Clayton Act . . . , which was enacted by the Congress to make available equitable remedies previously denied private parties, invokes traditional principles of equity and authorizes injunctive relief upon the demonstration of "threatened" injury. That remedy is characteristically available even though the plaintiff has not yet suffered actual injury . . . ; he need only demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur.

*Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 130, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129 (1969). The existence of threatened injury is sufficient to meet both the standing requirement and the case or controversy requirement. *Rohnert Park v. Harris,* 601 F.2d 1040 (9th Cir.), *cert. denied,* 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1979); *Paschall v. Kansas City Star,* 605 F.2d 403 (8th Cir. 1979); *Merit Motors, Inc. v. Chrysler Corp.,* 569 F.2d 666 (D.C.Cir. 1977); *Jeffrey v. Southwestern Bell,* 518 F.2d 1129 (5th Cir. 1975); *Industrial Communications, Inc. v. Pacific Telephone & Telegraph Co.,* 505 F.2d 152 (9th Cir. 1974).

The threat of future injury is clear as to all of the plaintiffs' antitrust claims. Fixed prices and restrictions on output will continue under the new contracts. NCAA has bound its members to a group boycott of broadcasters other than ABC, CBS and TBS. NCAA has threatened its members with a group boycott if they go outside of the new contracts. The Court has no doubt that the threat would have been carried out if the Court had not intervened, and is equally certain that the threats will be carried out in the future if the Court does not act. The NCAA administration and its allies among the membership have literally taken unto themselves the rights of the plaintiffs and others to sell their football games for broadcast on television. It is a power which NCAA has jealously guarded. The administration has clearly demonstrated its taste for retribution, and its willingness and ability to strike a crippling blow to the athletic programs of its members. The proof is as clear as it can be in matters of this sort that if the Court does not intervene, NCAA can and will use every means at its disposal to insure its continued domination of college football television in derogation of the rights of the plaintiffs.

The fact that a new plan is in effect for 1982 through 1985 does nothing to relieve the situation. The Court has found as fact that the anticompetitive aspects of past NCAA controls are carried over into the new contracts and regulations. The Court need not, as suggested by the defendant, sit back and observe the workings of the new contracts to determine whether they are anticompetitive. The plaintiffs have proved by clear evidence not only that the new contracts *may* restrain competition; the plaintiffs have proved that the new contracts *will* restrain competition in the same ways that past NCAA controls have restrained competition. The contracts and accompanying ground rules, in addition to the testimony of NCAA and network executives, clearly establish that there will be no significant changes in the anticompetitive features of the NCAA controls.

> A federal court has broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future, unless enjoined, may fairly be anticipated from the defendant's conduct in the past. . . . [W]hen one has been found to have committed acts in violation of a law he may be restrained from committing other related unlawful acts.

*NLRB v. Express Publishing Co.,* 312 U.S. 426, 435–436, 61 S.Ct. 693, 699, 85 L.Ed. 930 (1941).

■ NCAA has suggested that it will discontinue its role in the fixing of prices paid for individual games. That being so, urges NCAA, it is the networks and not NCAA which will be fixing prices. This argument ignores the fact that but for NCAA's presumptuous taking of the plaintiffs' right to sell their property, the networks would be in no position to fix prices. NCAA is the protagonist in this arrangement. In a suit to enjoin an illegal conspiracy, the plaintiffs need not name as defendants all of the conspirators. *Georgia v. Pennsylvania Railroad Co.,* 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051, *reh'g denied,* 324 U.S. 890, 65 S.Ct. 1018, 89 L.Ed. 1437 (1945); *Perryton Wholesale, Inc. v. Pioneer Distributing Co.,* 353 F.2d 618 (10th Cir.), *cert. denied,* 383 U.S. 945, 86 S.Ct. 1202, 16 L.Ed.2d 208 (1965).

■ Finally, NCAA advances a novel argument suggesting that because the plaintiffs seek to expand their respective football revenues and share of the football television market, that they have suffered no injury cognizable under the Clayton Act. In support of its argument, NCAA relies on *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977).

In that case, the defendant was Brunswick, a leading manufacturer of automated bowling lane equipment. The purchase of Brunswick equipment was an expensive undertaking, and Brunswick normally offered extended credit terms to buyers. As part of the credit agreement, Brunswick took as security the right to take over the buyers' bowling centers in the event of default.

Pueblo was in business as a bowling center, and was in competition with one of Brunswick's buyers. The competitor was unable to operate at a profit, and eventually defaulted on its debt to Brunswick. Brunswick then, in accordance with the credit agreement, took over as owner and operator of the buyer's bowling center. Pueblo sued Brunswick, alleging that Brunswick's takeover of the center was an illegal merger.

The measure of damages sought by Pueblo was the amount of increased profits it would have received had Brunswick not taken over the unprofitable bowling center. The Supreme Court rejected this claim as being contrary to the purposes of the antitrust laws. The Court said that

> the antitrust laws are not merely indifferent to the injury claimed here. At base, respondents complain that by acquiring the failing centers petitioner preserved competition, thereby depriving respondents of the benefits of increased concentration. The damages respondents obtained are designed to provide them with the profits they would have realized had competition been reduced.... It is inimical to the purposes of these laws to award damages for the type of injury claimed here.

429 U.S. at 488, 97 S.Ct. at 697.

NCAA argues that the plaintiffs here seek only to expand their profits at the expense of other competitors. NCAA contends that the increased revenues to the plaintiffs in this case which would result from a free market are the same as the damages sought by the plaintiffs in *Brunswick.* This argument is without merit.

NCAA apparently equates a damages award based on profits which would result from *reduced* competition with increased profits lawfully gained as a result of the *restoration* of competition. The plaintiffs here do not seek money damages in lieu of profits they could realize under reduced competition. Rather, they seek the opportunity to increase their profits in a truly competitive situation. The restricted and anticompetitive situation which now exists is beyond their power to change. Appropriately, they have petitioned this Court for an injunction which would restore the free market and allow them to do what the

antitrust laws dictate. They ask for the opportunity to compete. This case is not at all like *Brunswick,* and the defendant's argument is without merit.

The Court has considered the defendant's arguments that both standing and a live case or controversy are lacking in this matter. None are well-taken. This case presents a justiciable controversy and is properly before the Court.

## C. *The Sherman Act*

"The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade." *Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 4, 78 S.Ct. 514, 517, 2 L.Ed.2d 545 (1958). The Act prohibits "[e]very contract, combination ... or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1 (1980). Early on it was recognized that the Act could not be construed literally, since every agreement between producers or buyers in some way restrains trade. Thus, the Supreme Court has ruled that the Sherman Act prohibits only those contracts or combinations which "unreasonably" restrain competition. *Standard Oil Co. of New Jersey v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911).

■■■■ The basic policy of the Act is that economic competition be unrestrained. The policy rests on the premise that "the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic political and social institutions." *Northern Pacific Railway Co. v. United States, supra.* The Court is not allowed to determine whether competition is the wisest policy in any given industry, because Congress has determined that free and open competition shall be the rule of

commerce in our nation. Arguments describing the ruinous effect of competition in a particular industry are to be addressed to Congress, not the courts. *National Society of Professional Engineers v. United States, supra,* 435 U.S. at 689–90, 98 S.Ct. at 1364.

While the Sherman Act forbids only "unreasonable" restraints of trade, "there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pacific Railway Co. v. United States, supra,* 356 U.S. at 5, 78 S.Ct. at 518. These types of arrangements have been determined to be unreasonable *per se.* The practices which the courts have thus far determined to be unreasonable *per se* include price fixing, *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); group boycotts, *Klors, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); and horizontal agreements among competing sellers to limit the availability of their products. *United States v. Topco Associates,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972).

With these principles in mind, the Court will now analyze each of the plaintiffs' antitrust theories. As will be seen below, the Court finds that the NCAA controls constitute a *per se* violation of Section 1 of the Sherman Act. Additionally, the Court will go on to analyze the restraints under the rule of reason.

*Price-Fixing and Restriction of Output*

■■■■ Price-fixing is a *per se* violation of Section 1 of the Sherman Antitrust Act. *United States v. Socony-Vacuum Oil Co., supra; Arizona v. Maricopa County Medical Society,* —— U.S. ——, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982). If an activity is determined to be price-fixing, the courts may not inquire into the reasonableness of the price which has been established. *Id.*

NCAA first argues that the plaintiffs have failed to show literal price-fixing. This argument is not sustained by the Court's findings of fact. NCAA suggests that ABC is the price-fixer. NCAA says it will no longer "recommend" prices for the games, and injunctive relief is therefore unnecessary. The Court is not persuaded by this argument. The objectionable features of the NCAA package remain in place. The NCAA plan results, in most situations, in a single eligible buyer. The contracts' "minimum aggregate fee" is the minimum, maximum, and *actual* price which will be paid. The networks will continue to pay the same price for every national broadcast, and the same price for every regional broadcast.

It is true that some teams will receive an additional $250,000 if they agree to move a game from its scheduled date. But that does not represent additional income above the "minimum aggregate fee." That extra assessment is part of the contract price. All that means is NCAA has fixed a price for "move" games, as well as for the regular national and regional games.

Nor does NCAA's argument that ABC is the price-fixer have merit. ABC could not do so without the permission of NCAA. It is NCAA, not ABC, which has commandeered the rights of the plaintiffs. Only NCAA is so bold as to claim an exclusive right to sell college football to the networks. NCAA is the only entity with the ability to fix prices and restrict output in the market. NCAA is the defendant, and NCAA has fixed prices. NCAA's attempt to shift the blame cannot be allowed to succeed. It is the package which NCAA offers and the contract it ultimately executes which offends the Sherman Act. Perhaps it is not a classic method of price-fixing, but "the machinery employed by a combination for price-fixing is immaterial." *United States v. Socony-Vacuum Oil Co., supra,* 310 U.S. at 223, 60 S.Ct. at 844. In this case, it is clear that NCAA has literally established the price to be paid to colleges whose football games are televised.

However, the fact of literal price-fixing does not necessarily result in a finding of *per se* illegality. In *Broadcast Music, Inc. v. Columbia Broadcasting System,* 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979), the Supreme Court recognized that the defendant associations had literally fixed a price for the right to use the musical compositions of composers who were members of the associations. However, the Court pointed out that

> [T]his is not a question simply of determining whether two or more potential competitors have literally "fixed" a "price." As generally used in the antitrust field, "price-fixing" is a shorthand way of describing certain categories of business behavior to which the *per se* rule has been held applicable. The ... literal approach does not alone establish that this particular practice is one of those types or that it is "plainly anticompetitive" and very likely without "redeeming virtue." Literalness is overly simplistic and often overbroad.... Thus, it is necessary to characterize the challenged conduct as falling within or without that category of behavior to which we apply the label *"per se* price-fixing."

*Id.* at 8–9, 99 S.Ct. at 1556.

Thus, to find that NCAA has literally fixed the price of the rights to broadcast television football does not end the inquiry. While the Court does find that NCAA has literally fixed prices, a close examination of the effect of the NCAA controls is still appropriate. The inquiry "must focus on whether the effect ... of the practice [is] to threaten the proper operation of our predominantly free-market economy ...." *Id.* at 20, 99 S.Ct. at 1562. The issue is "whether the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output, and in what portion of the market." *Id.* at 21, 99 S.Ct. at 1563. On the other hand, if the activity increases efficiency and renders the market more competitive, it is not the type of activity which constitutes *per se* price-fixing. *Id.*

In support of its argument, NCAA relies heavily on the *Broadcast Music* case. NCAA urges that televised college football is in the nature of a "joint venture." NCAA theorizes that member universities must act in cooperation to produce their product, just as the actors, producers, directors and camera operators of a show such as "Dallas" must cooperate to present their product. Thus, like the performing rights societies in *Broadcast Music,* NCAA is a joint venture, according to the defendant.

The Court simply cannot accept this characterization. It is true that the staging of a college football game is a cooperative undertaking, but not in the sense NCAA proposes. The cooperative aspect is simply that it takes two teams to play a game. Those two teams must cooperate, but nothing more is necessary for the staging of the event. NCAA's theory may be seen in its true light using the following example.

Suppose each and every producer of situation comedy shows conspired among themselves to sell only a certain number of comedy series to the networks, each at a fixed price irrespective of their quality. Moreover, in this hypothetical situation, the networks are allowed to buy only a certain number of shows from any one producer, and therefore are limited in the number of shows they can purchase from those producers whose shows are of better quality than other producers. Suppose further that the networks are required to buy shows of inferior quality from smaller members of the conspiracy in order to obtain the shows they really want. Certainly the combination here described is in no sense a joint venture. It is a combination in restraint of trade. This is an exact description of the NCAA cartel.

The producers in this market are the various institutions fielding football teams. They have agreed among themselves to sell their games to the television networks. They demand that the networks buy a fixed number of games for broadcast—no more,

no less. They insist that the networks buy no more than three programs per year from quality producers such as Georgia, Oklahoma, USC and Notre Dame, thereby forcing the networks to buy programs from producers whose products are not so attractive. They set a price to be paid for the totality of games bought, and in effect set a price for each particular game. This is the situation shown by the evidence, and NCAA's characterization of this enterprise as a joint venture is incredible.

The NCAA television controls are in no meaningful way comparable to the activities of the defendants in *Broadcast Music.* The Court in *Broadcast Music* noted that the line of commerce being restrained existed only because federal law granted composers the right to copyright their compositions. The Supreme Court reasoned that the blanket license arrangement at issue was necessary to effectuate the rights granted by the copyright laws. The Court found it anomalous to suggest that a market arrangement necessary to protect a federally-created right was, at the same time, a *per se* violation of the Sherman Act.

■ No similar consideration exists in this case. First, there has been no suggestion that college football television is a line of commerce which exists only as a result of federal law. Moreover, the evidence is clear that the NCAA controls are not necessary for the protection of NCAA's members' right to sell their football games for broadcast. Defense expert witness Klein opined that if NCAA did not sell an exclusive package to the networks, the networks simply would not buy NCAA football games. Stated another way, it is the defendant's position that if NCAA did not act as an exclusive agent, with the power to bind all member institutions to a network contract, NCAA football would not be a viable piece of network programming. The networks pay the extraordinarily high price they pay for NCAA football because of the guarantee of exclusivity. Only NCAA can guarantee this exclusivity. Thus, reasons

the defendant, the NCAA controls are the only vehicle by which colleges can market their football games for television.

There can be no doubt that the package offered by NCAA is more attractive to the networks than that which any individual college could offer. However, that fact does not bring this case within the rule of *Broadcast Music.* The arrangement in *Broadcast Music* was found not only to be the most attractive means of marketing copyrighted compositions, but a *necessary* means of marketing that product. The Court found that without the type of licensing arrangement which the defendant had developed, the copyrighted property of member composers was practically valueless.

That is simply not true of the right to broadcast college football. The evidence is clear that many television broadcasters, both national networks and local stations, would buy the right to televise many individual college football games. Indeed, the evidence shows that many more games would be televised in a free market than are televised under NCAA controls. It is likely that fewer schools would appear on network broadcasts. The testimony of network executives makes clear that if it were up to them, they would show fewer games involving fewer teams than they are required to show under the NCAA controls. At the same time, however, the evidence shows that many more games involving many more teams would be shown on local and regional broadcasts. Thus, unlike the licensing arrangement in *Broadcast Music,* the NCAA controls are not necessary for effective marketing of the product.

Nor can it be said, as was the case in *Broadcast Music,* that the NCAA controls are necessary to protect the property rights of NCAA members from infringement by unauthorized users. The Supreme Court found in *Broadcast Music,* that an umbrella organization was *necessary* to adequately protect copyrighted compositions from infringement. The individual composers simply did not have the wherewithal to monitor the thousands of radio and television broadcasters which sought to use their compositions. The composers had no way of knowing if their copyright was being infringed by some remote individual broadcaster. Therefore, reasoned the Court, it was necessary for the composers to form an umbrella organization and pool their resources in order to effectively guard against unauthorized use of their compositions. In this case, there is no credible evidence suggesting that individual schools are unable to protect their property—football games—from unauthorized broadcasting.

Turning directly to the price-fixing aspect of the NCAA controls, NCAA argues that the establishment of the "minimum aggregate fee" is absolutely necessary to guarantee the colleges a reasonable rights fee from the networks. While this is certainly true, it is true only because NCAA has commandeered the right of its members to market their football games for television broadcast. Having bound its members to selling their rights only to certain networks, and having destroyed their ability to invite competitive bids for the right to broadcast their games, it *is* necessary for NCAA to negotiate a minimum aggregate fee. But this argument assumes the validity of NCAA's literal taking of the rights of these colleges to sell their football games to broadcasters. What NCAA argues, in essence, is that having formed an illegal cartel, restricted output, and organized a group boycott, it was necessary to fix the price of the product. That is not the teaching of *Broadcast Music,* and this argument has no merit.

This case is distinguishable from *Broadcast Music* in other key respects, as well. An important factor in *Broadcast Music* was that it was impossible for each composer to negotiate agreements with each radio and television broadcaster each time the broadcaster wanted to air one of the composer's copyrighted works. That factor is not present here. The colleges are clearly

able to negotiate agreements with whatever broadcasters they choose. We are not dealing with tens of thousands of relatively brief musical works, but with three-hour football games played eleven times each year. Thus, *Broadcast Music* is distinguishable on this ground.

The most important distinction, however, is that in the *Broadcast Music* arrangement there was nothing to prohibit an individual member-composer from selling broadcast rights to any broadcaster on an individual basis. Unlike the members of NCAA, the members of Broadcast Music, Inc., had not agreed among themselves that none of them would sell their rights outside of the blanket license arrangement. In this case, NCAA members have agreed—or have been forced to agree by the will of the majority—not to make their own individual arrangements with any network other than the networks with which NCAA has contracted. This feature is not meaningfully mitigated by the so-called "exception telecasts." For the plaintiffs and others, the exceptions are few and far between, and do not repair the market distortion caused by the NCAA controls.

The Court finds that the NCAA controls are not at all like the arrangement in *Broadcast Music.* The essence of the NCAA controls—indeed their raison d'etre —is to restrict competition. The controls distort the prices paid by the networks for the right to broadcast any given college football game. NCAA forces the networks to broadcast many games which the networks would not broadcast in the absence of the NCAA's controls. One of the stated purposes of the NCAA controls is to generate more revenue for smaller colleges than they could generate on their own in a free market. Another aspect of the controls is to reduce the market share which superior competitors—such as Oklahoma and Georgia—might win in a free and open market. In short, the NCAA controls are a repeal of the laws of supply and demand. Competition is eliminated, and the pernicious effects

of non-competition are present in abundance in the market of college football television.

NCAA suggests that its television controls have pro-competitive features, and therefore are not appropriate for condemnation under the *per se* rule. The Court considers this argument to be foreclosed by the recent decision of the Supreme Court in *Arizona v. Maricopa County Medical Society, supra.* In that case, a group of physicians established a maximum fee schedule for services rendered to policyholders of specified insurance plans. The Court held that the fee schedule constituted price-fixing and was illegal *per se.* In so holding, the Court said:

> The respondents' principal argument is that the *per se* rule is inapplicable because their agreements are alleged to have procompetitive justifications. The argument indicates a misunderstanding of the *per se* concept. The anticompetitive potential inherent in all price fixing arrangements justifies their facial invalidation even if procompetitive justifications are offered for some. Those claims of enhanced competition are so unlikely to prove significant in any particular case that we adhere to the rule of law that is justified in its general application.

—— U.S. at ——, 102 S.Ct. at 2477.

 This language is a clear indication that the *per se* rule applies even where the defendant alleges procompetitive justifications. This argument of NCAA therefore has no merit.

 NCAA next argues that this case is inappropriate for disposition under the *per se* rule because NCAA is a voluntary association and the television controls were developed through a democratic process. This argument fails for several reasons. First, as discussed above, membership in NCAA is not voluntary in any meaningful way. Second, the suggestion that the nature of NCAA as an organization requires a different treatment of its case is plainly contrary

to the law. "Whatever may be its peculiar problems and characteristics, the Sherman Act, so far as price-fixing arrangements are concerned, establishes one uniform rule applicable to all industries alike." *United States v. Socony-Vacuum Oil Co., supra,* 310 U.S. at 222, 60 S.Ct. at 843. Third, the fact that the NCAA controls were the product of a majority vote of the membership is of absolutely no significance. The fee schedules in the *Maricopa County* case were established by a vote of the members of the Society, but that did not save it from *per se* condemnation. It is clear that this argument of NCAA is without merit.

NCAA next argues that the television controls are ancillary to the other regulations imposed by NCAA in the areas of recruitment, rules of play, amateurism and grants-in-aid. NCAA urges that the television controls are part and parcel of the overall regulatory scheme, and therefore inappropriate for treatment under the *per se* rule. The so-called "ancillary restraint" doctrine holds that a restraint is valid if:

(1) It is reasonably necessary to accomplish the legitimate primary purpose of the arrangement, and of no broader scope than reasonably necessary;

(2) It does not unreasonably affect competition in the marketplace; and

(3) It is not imposed by a party or parties with monopoly power. *United States v. Addyston Pipe & Steel Co.,* 85 F. 271, 282 (6th Cir. 1898), *aff'd,* 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899); *United States v. Columbia Pictures Corp.,* 189 F.Supp. 153, 185–192 (S.D.N.Y. 1960).

The NCAA controls meet none of these criteria. While NCAA has a valid role to play in the regulation of college athletics, it has gone far beyond the pale of this legitimate purpose in commandeering the rights of its members to sell their games for television broadcast. The primary purposes of NCAA regulations are to preserve a competitive balance in college athletics, insure the amateurism of college athletes, and protect the physical well-being of college athletes. Neither plaintiff challenges the validity of these purposes. However, it does not follow that the television controls are either intended to or effective in furthering these goals.

NCAA produced a parade of witnesses to testify that the television controls are an absolutely essential element of the overall regulatory program. Among these witnesses were NCAA President James Frank, Executive Director Walter Byers, Television Committee Chairman Wiles Hallock, and an impressive array of university officials and athletic program administrators from several of America's finest colleges and universities. But none of them—not one single witness—was able to articulate any credible reason as to *why* it is necessary for NCAA to act as an exclusive agent with the authority to bind all NCAA members to an exclusive contract. That these gentlemen believed that to be the case is beyond doubt. But the accuracy in fact of the proposition they put forward is specious.

The far-reaching NCAA regulations governing college football, other than those relating to television, are clearly sufficient to accomplish the legitimate objectives of NCAA. NCAA limits the number of games the teams play each season. It limits the number of coaches and players a college football team can have. NCAA establishes all of the rules of play for college football. NCAA intensively regulates recruitment of high school athletes by the colleges to insure that these athletes are not offered inducements which would compromise their amateur standing. NCAA sets standards of academic achievement which student-athletes must meet to be eligible for intercollegiate competition. NCAA regulates the number of athletic scholarships a school may award in any given sport, including football.

This list is only a small part of the vast NCAA regulatory scheme. The Court is persuaded that these controls are sufficient

to accomplish the legitimate non-commercial purposes of NCAA. It follows that the controls exercised by NCAA over college football television are not necessary to preserve competitive balance on the playing field.

NCAA seeks to escape this result, arguing that the increased revenues which schools such as Georgia and Oklahoma would receive in an open market would give them an overwhelming advantage over other schools. The large revenues could be channeled into the recruitment and training of better and better football teams. Schools which did not generate such revenues could never, in NCAA's view, hope to compete with the "power elite" of fifteen or twenty schools which would result from a free market situation.

The Court cannot accept this view for several reasons. First, the plaintiffs made clear at trial that increased football television revenues are not going to be funneled back into their football programs. Drs. William Banowsky and Fred Davison, Presidents of Oklahoma and Georgia, respectively, made clear that the antitrust activities of NCAA do not destroy the profitability of their football programs. The plaintiffs will continue to play football whatever the ultimate outcome of this litigation, and they will do so at a profit. But the other sports currently offered at these schools *will* suffer. The anticipated revenues from free market football television will not assist the football programs so much as it will the golf, basketball, wrestling, swimming and baseball programs. The Court also notes with approval the efforts of the plaintiffs to improve their athletic programs for women. This commendable undertaking is jeopardized by the plaintiffs' inability to maximize revenues from college football television. The Court finds that these fears of NCAA are overstated for this reason.

Second, if NCAA's purpose is to avoid the creation of a "power elite," it has failed. The documentary evidence reveals that there already exists this "power elite" which NCAA so fears. Along with the plaintiffs, schools such as Notre Dame, University of Alabama, University of Nebraska, Pennsylvania State University, Ohio State University, University of Michigan, USC, and the University of Pittsburgh form a "power elite." They are the teams that are televised most frequently. Notably, the televised games of these schools produce far better ratings than games between lesser-known schools.

Nor is it impossible for schools with lesser-known football programs to break into this elite group. The documentary evidence shows that in recent years, schools such as Clemson University, Pittsburgh and Georgia have achieved dramatic increases in television exposure and, of course, television revenues.

NCAA submits that if it is not allowed to control football, the "power elite" will systematically rout their opposition on the field, thereby alienating viewers, and ultimately destroying the marketability of college football. This argument borders on frivolous. What NCAA argues, in essence, is that competition will destroy the market. This argument is hardly novel. It has been consistently rejected by the courts, and it will be rejected now. As the Supreme Court said in *Socony-Vacuum,*

> Congress has not left with us the determination of whether or not particular price-fixing schemes are wise or unwise, healthy or destructive. It has not permitted the age-old cry of ruinous competition and competitive evils to be a defense to price-fixing conspiracies. It has no more allowed genuine or fancied competitive abuses as a legal justification for such schemes than it has the good intentions of the members of the combination.

310 U.S. at 221–222, 60 S.Ct. at 843.

The basic policy of the Sherman Act is free competition. If NCAA is correct about the "power elite," and if viewers lose interest in one-sided games, the free market should and will resolve the problem. The networks will respond to poor ratings by

showing more competitive games. That is how the market should operate, and that is what the Sherman Act demands.

Finally, the Court notes that if a "power elite" emerges, and if it abuses its competitive edge through illegal means, relief will be available under the antitrust laws. If today's victim of a price-fixing conspiracy is tomorrow's price-fixer, the Sherman Act can be employed against it. Free market competition must be restored to this industry, and the Sherman Act guarantees that it will be maintained.

Finally, NCAA insists that its activities are not price-fixing because it does not have market power. Of course, the Court has determined that NCAA does have market power. But even if that were not so, NCAA's argument is without merit. "Any combination which tampers with price structures is engaged in unlawful activity. Even though the members of the price-fixing group were in no position to control the market, to the extent that they raised, lowered or stabilized prices they would be directly interfering with the free play of market forces. The [Sherman] Act places all such schemes beyond the pale and protects that vital part of our economy against any degree of interference." *United States v. Socony-Vacuum Oil Co., supra*, at 221, 60 S.Ct. at 843. Simply put, "price fixing is contrary to the policy of competition," and "[i]t makes no difference . . . whether the participants possess market control . . . ." *United States v. McKesson & Robbins, Inc.*, 351 U.S. 305, 309–310, 76 S.Ct. 937, 939–940, 100 L.Ed. 1209 (1956).

■ The Court thus concludes that the NCAA television controls are not mere "ancillary" restraints. They are much more far-reaching than necessary to accomplish the legitimate purposes of NCAA. They not only inhibit competition, they destroy it. NCAA has market power, and has employed that power to both fix prices and restrict output. The controls are naked restraints, whose only purpose is to restrict

free market forces. The controls result in a marketplace vastly different from that to be expected in the free market. The television controls of NCAA are *per se* violations of § 1 of the Sherman Act.

*Group Boycott*

Group boycotts, or concerted refusals by traders to deal with other traders, have long been in the forbidden [*per se*] category. They have not been saved by allegations that they were reasonable in the specific circumstances, nor by a failure to show that they "fixed or regulated prices, parcelled out or limited production, or brought about a deterioration in quality." . . . For . . . "such agreements, no less than those to fix minimum prices, cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment."

*Klor's Inc. v. Broadway-Hale Stores, Inc., supra*, 359 U.S. at 212, 79 S.Ct. at 709 (citations omitted).

■ The plaintiffs assert that the NCAA controls constitute a group boycott. The Court has described in its findings of fact the way this group boycott operates. The Court now concludes that, as a matter of law, the NCAA controls constitute a group boycott and are illegal *per se* under § 1 of the Sherman Act.

Group boycotts can operate in a number of different ways. For instance, a group of producers can conspire to boycott other producers. *See Associated Press v. United States*, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945). The conspirators in *Associated Press* agreed that none of them would sell their product, news, to competitors of the conspirators. Any violation of the agreement could result in sanctions against the violator ranging from fines to expulsion. By agreeing not to sell to each other's competitors, the conspirators crippled their competitors' ability to effectively compete.

The same situation exists in this case. As in *Associated Press,* group members who

violate NCAA rules are subject to expulsion. NCAA members have agreed that none of them will allow their football teams to appear on television against the football team of a non-member. The non-member is then not only crippled, but completely unable to produce its product, football games, for sale to broadcasters. Therefore, the non-member of NCAA is unable to compete with NCAA members in selling football games to broadcasters.

Another form of group boycott is found in *Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.*, 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961). In that case, the American Gas Association had established a testing procedure for determining the safety and efficiency of gas burners. The Association consisted of utility companies which distributed gas, pipeline companies which transported gas, and manufacturers of gas burners. Unless a particular gas burner received the Association's seal of approval, the gas distributors would not supply gas for use in that burner.

The plaintiff was a manufacturer of gas burners seeking to enter the market. It submitted its burner to the Association for approval, but did not receive the seal of approval. The gas distributors would not, therefore, supply gas for such burners, and the product was therefore worthless to the buying public. The plaintiff alleged that the Association's standards were not designed to test efficiency and safety, but rather to insulate from competition those members of the Association who were manufacturers of burners. The Supreme Court held that these allegations were sufficient to state a claim of group boycott under § 1 of the Sherman Act.

The NCAA controls operate in a similar fashion. Non-members of NCAA, as discussed above, cannot appear on television against NCAA members. Thus, as in *Radiant Burners*, group members can withhold from non-members an input without which the non-member's product is worthless. Just as a gas burner is worthless without gas, a football team cannot produce its product without an opponent. The NCAA controls in effect deprive the non-member of the means of producing its final product, a football game. It is clear that neither plaintiff could market its product if not allowed to televise their games against NCAA members. NCAA membership is as critical to the plaintiffs' business success as the American Gas Association's seal of approval to the plaintiff in *Radiant Burners.*

Another form of restraint which the Supreme Court has determined to be a group boycott is found in *Fashion Originators Guild of America v. Federal Trade Commission*, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941). In that case, a group of manufacturers agreed among themselves to refuse to sell to retailers who dealt in inexpensive copies of the original designs of the group members. The boycott was intended to drive the so-called "fashion pirates," horizontal competitors of the conspirators, out of business. The technique employed was to threaten retailers with a boycott if those retailers bought from the blacklisted manufacturers. In other words, a group of sellers agreed to boycott any buyer who bought from certain seller-competitors of the conspirators.

In this case, NCAA members have agreed not to sell their product—football games—to certain buyers. Every broadcast and cable network in the country, other than ABC, CBS and TBS, are being boycotted. Further, those local broadcasters which are not affiliated with ABC or CBS are allowed to buy football games only in very limited circumstances.

The situation here is somewhat different from that in *Fashion Guild.* Unlike the "fashion pirates" in *Fashion Guild,* the buyers being subjected to the boycott have done nothing to provoke such a boycott. Another distinguishing factor is that it is not the horizontal competitors of the boycotted buyers which have organized and enforced the boycott. Instead, the sellers themselves have increased, through concert-

ed action, the value of their collective product by promising ABC, CBS and TBS that they will boycott all other networks.

However, while there are factual distinctions between this case and *Fashion Guild,* the effect of the boycotts in the two cases are the same. The boycott narrows the outlets to which producers of college football can sell by prohibiting dealings with NBC. It subjects all buyers and sellers of college football television rights to an organized boycott if they refuse to comply with the controls. The NCAA boycott "has both as its necessary tendency and as its purpose and effect the direct suppression of competition." *Fashion Guild, supra,* at 465, 61 S.Ct. at 706. Indeed, as was the case in *Fashion Guild,* "the combination is in reality an extra-governmental agency, which prescribes rules for the regulation and restraint of interstate commerce, and provides extra-judicial tribunals for determination and punishment of violations . . . ." *Id.* The NCAA "trenches upon the power of the national legislature and violates the statute." *Addyston Pipe & Steel Co. v. United States,* 175 U.S. 211, 242, 20 S.Ct. 96, 107, 44 L.Ed. 136 (1899).

The Court has no difficulty in concluding that NCAA has organized a group boycott. Indeed, it is the ultimate group boycott, far more powerful and effective than those in the cases discussed above. There is an absolute refusal to deal with all of the major competitors of ABC, CBS and TBS. Broadcasters like NBC, the Hughes Sports Network, MetroMedia and TVS cannot buy NCAA football for network broadcast. Cablecasters such as the ESPN and USA networks cannot buy NCAA football for cablecast. There are no exceptions. The producers of college football have horizontally agreed that they will refuse to deal with these buyers. The existence of a group boycott could not be more clear.

The existence of a group boycott against horizontal competitors of NCAA members is also clear. The non-member of NCAA which wishes to sell its football games for television is subjected to a boycott. NCAA members are in a more powerful position than any of the combinations described above. NCAA members dominate the college football television market. The amount of college football televised outside of the NCAA contracts with the networks is minimal. NCAA members will not play televised games against non-members. They have the power to withhold from their competitors a key ingredient of the product. There is no doubt that NCAA has organized a group boycott, enforced the rules of that boycott, and employed threats and coercion to maintain the boycott.

Thus, the existence of a group boycott is clear from the evidence. However, NCAA asserts that the plaintiffs do not have standing to litigate the issue of whether NCAA members have organized a boycott against broadcasters and cablecasters other than ABC, CBS, and TBS. Further, NCAA argues that, as to the NCAA boycott against non-member horizontal competitors, there is no case or controversy since both Oklahoma and Georgia are members of NCAA and are not subjected to the boycott. Both the case or controversy and the standing requirements are met in this case. The plaintiffs are themselves injured by the boycott against the competitors of ABC, CBS and TBS. If the defendant had not commandeered the plaintiffs' right to sell to whomever they pleased, the plaintiffs would have received greater rights fees. Because of the boycott, they are unable to sell to the highest bidder, and therefore realize less income, than they would if the boycott did not exist. This is certainly the sort of antitrust injury which the Sherman Act was meant to prevent, and for which the Clayton Act provides remedies. The plaintiffs have proved the existence of a group boycott, and the Court holds that this boycott is a *per se* violation of Section 1 of the Sherman Act.

### The Rule of Reason

Although the Court has concluded that the NCAA controls constitute a *per se*

**1314**

violation of the Sherman Act, it seems appropriate, nonetheless, to examine the restraint under the Rule of Reason. In large part, the *per se* rule was developed for the purpose of avoiding detailed inquiry into an industry where such an inquiry is unlikely to reveal procompetitive justifications for the challenged restraint. In this case, the Court has already undertaken a detailed inquiry into this industry, and the interest of litigation efficiency is not offended by conducting a Rule of Reason analysis. Moreover, the unique nature of college football, in combination with the fact that an extensive inquiry into the industry has already been conducted, makes it advisable that the restraints be analyzed under the Rule of Reason. *Cf., Mackey v. National Football League,* 543 F.2d 606 (8th Cir. 1976), *cert. denied,* 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977).

In conducting a Rule of Reason analysis, it is useful to first note what is not to be considered. "Contrary to its name, the Rule does not open the field of antitrust inquiry to any argument in favor of a challenged restraint that may fall within the realm of reason. Instead, it focuses directly on the challenged restraint's impact on competitive conditions." *National Society of Professional Engineers v. United States, supra,* 435 U.S. at 688, 98 S.Ct. at 1363.

■■■ Thus, while the fact-finder is to consider all of the circumstances in determining the reasonableness of the restraint, *Arizona v. Maricopa County Medical Society, supra,* —— U.S. at ——, 102 S.Ct. at 2471; *Continental TV, Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1972), certain inquiries are forbidden. The Court may not, for instance, inquire into the reasonableness of the prices set by a price-fixing combination. *United States v. Addyston Pipe & Steel Co., supra,* at 282–283. Nor may the Court entertain the argument that because of an industry's special characteristics, monopolistic arrangements are better for the industry than competition. *United States v. Trans-Mis-*

*souri Freight Ass'n,* 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007 (1897); *National Society of Professional Engineers v. United States, supra,* 435 U.S. at 689, 98 S.Ct. at 1364. Rather, the inquiry mandated by the Rule of Reason is whether the challenged restraint "is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." *Chicago Board of Trade v. United States, supra.* If the restraint is such as may suppress or destroy competition, it is an unreasonable restraint.

■■■ A finding of unreasonableness may be based on either the nature or character of the contracts, or on surrounding circumstances giving rise to the inference that they were intended to restrain trade or enhance prices. *National Society of Professional Engineers v. United States, supra,* 435 U.S. at 690, 98 S.Ct. at 1364; *Standard Oil Co. v. United States, supra,* 221 U.S. at 58, 31 S.Ct. at 515. Under either branch of the test, the inquiry is confined to a consideration of the impact on competitive conditions.

In making this determination,

[T]he court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.

*Chicago Board of Trade v. United States, supra.* See also *Arizona v. Maricopa County Medical Society, supra,* —— U.S. at —— n. 13, 102 S.Ct. at 2472 n. 13; *United States v. Topco Associates, supra.*

■■■ Applying the Rule of Reason to this case, the Court concludes that the NCAA

controls are unreasonable restraints on competition and therefore illegal. The restraints are illegal under both branches of the *Standard Oil* test. The controls are unreasonable by their very nature and character, and the history and circumstances surrounding the controls lead readily to the inference that they were intended to restrain and enhance prices. *Standard Oil Co. v. United States, supra; National Society of Professional Engineers v. United States, supra,* 435 U.S. at 690, 98 S.Ct. at 1364. The Court will first examine the history and circumstances surrounding the controls.

The history of the NCAA television controls has been recounted in the Court's findings of fact. The NCAA restraints were adopted in 1952. Many NCAA members were concerned that the televising of college football would hurt the gate attendance at their games. The purpose of the controls was to avoid a decrease in live gate attendance. NCAA was made the vehicle for the controls, because most of the nation's football-playing colleges were members of NCAA, and NCAA had traditionally regulated other aspects of college football. It therefore seemed appropriate that NCAA be the vehicle for regulating college football television.

Whether the NCAA controls have had the effect of protecting live gate attendance is a matter of great dispute between the parties. The Court has concluded that there is no persuasive evidence that the NCAA controls actually protected gate attendance, particularly in recent years.

Over the years the purpose of the controls has changed. It has become clear that the major purpose of the controls is no longer to protect gate attendance, although NCAA contends that it is. Instead, the main purpose of the controls is to maximize the football television revenues of member schools. The evidence is clear that the less-prominent schools receive far more in rights fees than they could expect in a market free of the controls. It is also clear that a number of schools could expect to receive larger rights fees in a free market than they have under the NCAA-controlled market. The NCAA, in a very real sense, takes revenue from the most prominent football schools, keeps a large share for itself, and distributes the rest to many of the less prominent members. The controls are no longer designed to protect gate attendance so much as to enhance the television revenues of less prominent members, and to provide NCAA with income.

An analysis of the controls themselves makes this conclusion clear. Under the controls, a full nine hours of college football will be televised on several Saturdays of the coming football seasons. Quite obviously, if televised football injures gate attendance, the NCAA plan does little to avoid this injury.

Even more telling are the provisions relating to the number of games to be televised. NCAA fixes the number of games to be televised by the networks. The number of games to be shown on the networks is higher than the networks would show in an unrestricted market. NCAA restricts the number of times any one team can appear on the networks, and fixes the number of different teams which must appear over the period of the contract. The networks, in the absence of NCAA's controls, would show more of some teams than they are allowed under the controls, and would show fewer different teams than required under the NCAA controls.

NCAA has, in past years, effectively fixed the price the networks pay to the schools for the right to any given game. Under the new contracts, the same type of price-fixing will occur. In most instances, the price is higher than the networks would pay in the absence of the controls. In other instances, the price is probably lower than the networks would be willing to pay in an unrestricted market.

It is obvious that the purpose of the controls is to enhance the television revenues of less prominent football-playing schools. There could be no other reason for

the fixing of a uniform price. While it is possible that the appearance limitations on individual teams may have been originally intended to protect gate attendance, the more likely and direct result is that less prominent football-playing schools will appear on network television when they otherwise would not. The Court is satisfied that the goal of maximizing revenues is far more important to NCAA than that of protecting gate attendance.

NCAA does not really deny that its plan is intended to give smaller schools more television revenue than they would otherwise receive. Instead, NCAA contends that this sharing of the wealth is necessary to preserve a competitive balance on the playing field. The Court has already rejected this argument as being contrary to both the facts and the law. It is clear that the NCAA restraints are much more far-reaching than necessary to achieve competitive balance. Moreover, the Court concludes that whatever marginal contribution the controls make to preservation of competitive balance is overwhelmed by the violence which the controls inflict on the free market economy.

The cases cited by NCAA are inapposite. Several courts have analyzed the non-commercial activities of NCAA and concluded that they were reasonable methods of preserving and regulating competition in intercollegiate football. *See Board of Regents of the University of Oklahoma v. NCAA,* 561 P.2d 499 (Okla. 1977); *Hennessey v. NCAA,* 564 F.2d 1136 (5th Cir. 1977); *Jones v. NCAA,* 392 F.Supp. 295 (D. Mass. 1975). The Court would agree with these other courts that the NCAA regulations at issue in those cases were valid under the Rule of Reason. However, none of these cases dealt with the commercial activities of NCAA. These activities are far different from regulations governing the size of coaching staffs or rules on academic eligibility. There is only a tenuous relationship between such non-commercial regulations and the marketplace. Moreover, the non-

commercial regulations relate more directly and effectively to the preservation of competitive balance. In this case, the commercial activities of NCAA have a direct and substantial anti-competitive effect on the marketplace, and contribute only indirectly, if at all, to the legitimate non-commercial goals of NCAA. For these reasons, the Court is neither bound nor persuaded by the cases cited by NCAA.

The fact that NCAA exercised its power pursuant to legislation passed by the membership is of no moment. It is true that NCAA first engaged in this commercial regulation only at the request of its members. However, since that time, the administration of NCAA has steadily increased the extent of its commercial regulation far beyond that original authorization. It is most notable that when the plaintiffs first joined NCAA, there was nothing in NCAA's organic documents even suggesting that NCAA had the power to regulate the commercial activities of the members' athletic programs.

By 1971, NCAA had adopted far-reaching and very restrictive regulations governing football television, even though there was still no reference to such authority in the Constitution or Bylaws. In that year, NCAA finally added Bylaw 11–3–(aa). Notably, that Bylaw says only that the Television Committee "shall be responsible for the formulation and administration of the Association's football television policy and program...." Nothing in this Bylaw could be read as granting NCAA the pervasive authority it now exercises.

In the mid-1970's, the NCAA administration proposed to the membership an amendment which would have, for the first time, made clear the extent of the authority NCAA believed itself to have. This amendment seems to have been in part a product of afterthought, and in part a product of the realization that NCAA was acting far beyond the authority recognized in the Bylaws. As it happened, the amendment was never put to a vote because of an over-

crowded agenda of more pressing business. Interestingly, such a proposal was not again presented to the membership until after the plaintiffs challenged the validity of the controls in this Court.

NCAA essentially commandeered the rights of its members to freely market their product. It was only after the members of CFA had made clear that they believed NCAA had overstepped its authority that NCAA made its first official statement as to its power over college football television. The "Official Interpretation" handed down by the NCAA Council on April 18, 1981, was the first clear statement by NCAA of its belief in its right to act as the exclusive vehicle for marketing the football games of its members. Having slowly but steadily increased its role in the commercial affairs of its members, NCAA made a belated attempt to legitimize its seizure of power and justify its domination of college football television.

Even since the filing of this lawsuit, the NCAA administration and its allies in the membership have acted to consolidate NCAA's power. At the December, 1981 Special Convention and the January, 1982 Annual Convention, NCAA adopted resolutions and amendments to its Bylaws belatedly "authorizing" NCAA to commandeer the rights of its members to market their product. NCAA would have the Court view these events as democracy in action, but there is nothing noble about what these Conventions achieved.

The plaintiffs and other CFA members attempted to persuade the majority of NCAA members that NCAA had gone far beyond its legitimate role in football television. Not surprisingly, none of the CFA proposals were adopted. Instead, the membership uniformly adopted the proposals of the NCAA administration which "legitimized" NCAA's exercises of power. The result was not surprising in light of the makeup of the voting membership. Of approximately 800 voting members of NCAA, 500 or so are in Divisions II and III and are not subjected to NCAA television controls. Of the 275 Division I members, only 187 play football, and only 135 were members of Division I–A at the time of the January Convention. Division I–A was made up of the most prominent football-playing schools, and those schools account for most of the football games shown on network television. Therefore, of some 850 voting members, less than 150 suffer any direct restriction on their right to sell football games to television.

In light of these numbers, it is hardly surprising that the NCAA administration was able to garner an overwhelming majority of the members to support its proposals. This is particularly true when one considers that the NCAA contracts provide many millions of dollars directly to NCAA, some 20% of NCAA's annual budget. Without this income, NCAA would be forced to either cut back on its programs, increase membership dues, or look for other sources of income. It is easy to see why the vast majority of NCAA members find it in their best interest to have NCAA control college football television.

The history and circumstances of the NCAA controls compel the inference that their purpose is to enhance prices. They achieve this purpose by restricting output and fixing prices. They do not merely regulate and promote competition. Instead, they suppress competition to the point of destruction. The controls are therefore unreasonable restraints of trade and illegal under the Sherman Act.

Turning to the other branch of the *Standard Oil* test—whether the controls are, by their very nature and character, unreasonable—the Court must again conclude that the controls are illegal. The controls clearly are of such a nature that they offend on their face the policy of open competition dictated by the Sherman Act.

Many untoward characteristics inhere in the NCAA controls. The controls dictate which broadcasters and cablecasters NCAA members may deal with, and which they

may not. The schools are not allowed to test the marketplace; they are locked into dealing with only certain networks. The schools are not even free to deal with local broadcasters except in the very limited situations where "exception telecasts" are allowed.

In a competitive market, each football-playing institution would be an independent seller of the right to telecast its football games. Each seller would be free to sell that right to any entity it chose. Most often the seller would sell to the higher bidder, although that need not always be the case. Quite obviously, the NCAA controls do serious violence to the competitive forces which should determine which telecaster ultimately wins the right to televise any particular game.

Turning to the price paid for the product, it is clear that the NCAA controls utterly destroy free market competition. NCAA has commandeered the rights of its members and sold those rights for a sum certain. In so doing, it has fixed the minimum, maximum and actual price which will be paid to the schools appearing on ABC, CBS and TBS. NCAA has created the mechanism which produces a uniform price for each national telecast, and a uniform price for each regional telecast. Because of the NCAA controls, the price which is paid for the right to televise any particular game is responsive neither to the relative quality of the teams playing the game nor to viewer preference.

In a competitive market, each college fielding a football team would be free to sell the right to televise its games for whatever price it could get. The prices would vary for the games, with games between prominent schools drawing a larger price than games between less prominent schools. Games between the more prominent schools would draw a larger audience than other games. Advertisers would pay higher rates for commercial time because of the larger audience. The telecaster would then be willing to pay larger rights fees due to the increased prices paid by the advertisers. Thus, the price which the telecaster would pay for a particular game would be dependent on the expected size of the viewing audience. Clearly, the NCAA controls grossly distort the prices actually paid for an individual game from that to be expected in a free market.

Turning next to the availability of the product, the NCAA controls limit free market forces in a number of ways. First, the controls force the networks to show more games involving the less prominent football schools than they would if it were left up to them. The controls restrict the number of games shown by local telecasters far below that which would be shown in a free market.

The controls also prevent the broadcast networks from showing more than six games over two years involving any particular team. In a free market, some teams would likely be shown more than six times over two years. The controls also require that 82 different teams be shown on the broadcast networks over a two-year period. The testimony of network executives makes clear that many fewer teams would be seen on the networks in the absence of the NCAA controls.

Thus, the evidence is clear that the NCAA controls cause the number of games shown to the viewing public to be very different from that which would be shown in a free market. Fewer different teams would appear on the networks, and more games involving more teams would be telecast by local and regional stations, in the absence of the NCAA controls. It is clear therefore that NCAA has drastically affected the number of games seen on television. To put it a different way, NCAA has restricted output.

It is clear that the NCAA controls have a devastating effect on competition. By their very nature, they inevitably result in price manipulation, restriction of output, and severe limitations on the options of both buyers and sellers. It cannot be said that their

effect on the market is *de minimus.* NCAA dominates the entire market of college football television. The NCAA controls affect every single college football game shown on television. They affect nearly every aspect of the market.

Perhaps its most pernicious aspect is that under the controls, the market is not responsive to viewer preference. Every witness who testified on the matter confirmed that the consumers, the viewers of college football television, receive absolutely no benefit from the controls. Many games for which there is a large viewer demand are kept from the viewers, and many games for which there is little if any demand are nonetheless televised.

Nor are there any redeeming pro-competitive benefits. The controls have not been shown to protect gate attendance, nor do they preserve a competitive balance among the schools. The only benefits from the plan go to NCAA itself, and the less prominent schools whose games would not appear on network television in the absence of the controls. Consumer demand and the free market are sacrificed to the interests of the NCAA administration and its allies among the membership.

The Court therefore concludes that the NCAA controls are unreasonable naked restraints on competition, both by their nature and by virtue of surrounding circumstances which compel the inference that they were intended to restrain competition. It is clear that NCAA is in violation of Section 1 of the Sherman Act.

*Monopolization*

The plaintiffs have alleged that NCAA has monopolized the market of college football television. The Court has concluded that college football television is the relevant product market for measuring NCAA's power to raise prices and restrict competition.

The issue of relevant market was hotly contested at trial. NCAA relied on the testimony of Dr. William Landes. Dr. Landes conducted a number of analyses which led him to conclude that college football television is not a separate market. The Court has rejected Dr. Landes' conclusion for the following reasons.

Dr. Landes notes in his report to the Court that in a competitive industry, the price of a product is determined by the interplay of consumer demand and the marginal cost of producing each extra unit of the product. Consumer demand rises and falls depending upon the price of a product. As the price of a product rises, the demand for that product falls, because consumers will substitute other products for the one for which the price has increased. The demand curve reflects the value to the consumer of the last unit demanded. Ordinarily, individual producers maximize their profit when the cost of producing each extra unit is equal to the value to the consumer of the last unit demanded.

But college football is an exception to this general rule. For both the individual schools and NCAA, the marginal cost of producing a football game for television is practically nil. This is due to the fact that a football game is going to be played whether or not the game is going to be televised. The costs of staging the game are going to be incurred even if the game is not televised. That being so, it costs the school nothing to produce a game for television, since the costs are going to be incurred in any event. Therefore, the assumption that profit maximization occurs when marginal cost equals demand is not valid in the case of college football television.

In the ordinary industry, the monopolist determines maximum profit by computing marginal revenue. Marginal revenue is the profit the monopolist can make by selling one additional unit of product. It is computed by taking the price of the last unit sold and subtracting the revenue that is lost on the sale of earlier units because the price of those units must also be reduced, assuming that the price is to be uniform. The monopolist makes its maximum profit at

the point where marginal revenue and marginal cost are equal. The intersection of marginal cost and marginal revenue results in a lower quantity and higher price for the monopolized product than would result in a competitive market.

Again, college football is not at all like most other industries. Because the marginal cost is zero for producers of televised college football, the marginal cost and marginal revenue curves never intersect. Dr. Landes' opinions in this case are based in large part on standard micro-economic theory involving the interplay of marginal revenue and marginal cost. However, in the case of college football television, the standard theory has no application due to the absence of the marginal cost element. The assumptions which underlie Dr. Landes' conclusions are therefore incorrect, and the Court can give no weight to the conclusions he has reached on the basis of those assumptions.

Dr. Landes' study is fallible in other key respects. For instance, Dr. Landes concludes that NCAA does not have market power because it cannot reduce output and thereby raise prices as would the ordinary monopolist. He bases his conclusion on the fact that both the price and the number of games shown have increased over the years.

This conclusion is suspect for two reasons. First, even if it were true that NCAA has not reduced output, that certainly does not mean that it does not have the power to do so. Second, Dr. Landes apparently assumes that at some time in the past, the number of games shown on television was equal to the number which would have been shown in the absence of the controls. Unless that assumption is correct, the fact that the number of games televised has increased over the years proves little if anything. The question is not whether NCAA has reduced output from one year to the next. Rather, the question is whether NCAA has, throughout the history of the controls, kept output below the level which would have occurred in a free market.

The Court has found as fact that many more college football games would have been televised in the past were it not for the NCAA controls. That being the case, it is easy to understand why both price and output have increased, when in the ordinary monopolized market, output is decreased while prices rise.

The reason for this departure from the ordinary monopoly model is that NCAA has been a monopolist from almost the very moment the market came into being. Ordinarily, once a product comes into being, a number of firms enter the market and compete with one another. Eventually, one of the firms may achieve prominence in the market either by preying on smaller firms or by superior competitive practices. Only when the prominent firm has achieved a monopoly does it reduce output and raise prices.

In the case of NCAA and college football television, the market has always been monopolized. From practically the very time college football television came into being, NCAA has monopolized the product. NCAA restricted output from the very beginning. The current output of televised college football remains far less than that which would occur in a free market. It is therefore cavil to say that a marginal increase in the number of games NCAA allows to be televised indicates an absence of market power. Dr. Landes' assumption that output and price under the NCAA controls were at some point the same as they would have been in a free market is incorrect.

Once a firm has achieved a monopoly position in an industry, reduced output and raised prices, it maintains its monopoly price by marginally increasing output and prices. The only difference between NCAA and the classic monopolist is that NCAA has monopolized the market from the outset. Having done so, it maintained its monopoly price by allowing only marginal increases in the number of television exposures per season. At no point has NCAA

allowed the number of exposures which a free market would bear.

Dr. Landes fails to take into account the fact that NCAA has controlled the market from the time the market came into being. He makes no attempt to compare output and prices under NCAA's controls to the output and prices which would be expected in a free market. By merely observing a monopolized market and incorrectly assuming that it was at some point a free market, he assumes his result and begs the question. Dr. Landes' analysis of the price of college football television therefore proves nothing, and is of little assistance in resolving the issues before the Court.

Dr. Landes' study of advertising patterns is equally unpersuasive. The plaintiffs have argued that college football has a unique appeal to advertisers. This would explain their willingness to pay a very high price to advertise on college football despite the fact that the viewing audience is small compared to most prime time programming. Dr. Landes sought to rebut this argument by analyzing the conduct of the firms which advertise on NCAA football.

Dr. Landes computed the amount spent by NCAA football advertisers for all of their network advertising during the year 1981. Dr. Landes then studied the amount spent by these advertisers for commercial time on NCAA football telecasts, the amount spent for commercial time on all sports programming, and the amount spent for commercial time on non-sports programming. The average amount spent by these advertisers for commercial time on NCAA football telecasts constituted only 5.18% of the total amount these advertisers spent on network advertising in 1981. Dr. Landes concluded from this fact that these advertisers were not tied to NCAA football, and freely substituted other programming for airing their commercials.

At first blush, it seems that Dr. Landes' point is well-taken. However, further inquiry reveals that the figures upon which Dr. Landes relies in fact support the opposite conclusion. Consider the following. In 1981, there were 24 exposures of NCAA football. Each exposure lasted approximately three hours. Therefore, there were only 72 hours of regular season college football on network television in 1981. Next consider that each of the networks provide an average of approximately 15 hours of programming on each day of the calendar year. Therefore, the total amount of network programming was about 16,425 hours in 1981. NCAA football comprises only .0044% of the total network programming on which an advertiser could have purchased commercial time in 1981.

This figure puts Dr. Landes' study in a new light. Those advertisers which bought commercial time on network telecasts of NCAA football spent an average of a little more than 5% of their total network advertising budget on programming which constituted less than .005% of the total programming available in 1981. In other words, network college football drew from these advertisers over 1000 times more of a percentage of their advertising budgets than its percentage share of total available programming. Obviously, this figure overstates the point, since some programming is not suitable for some advertising. Insurance companies, for instance, do not buy commercial time on children's programs. However, this analysis clearly indicates that in the view of these advertisers, the benefits of advertising on college football telecasts are worth an extraordinarily large percentage of their advertising budget in proportion to the total amount of programming which is available. Add to this the fact that college football advertisers spend 2½ times more per viewer to advertise on NCAA football than is paid on the average to advertise on other programming—a fact to which defense expert witness Klein testified—and the fact of college football television's extraordinary appeal to advertisers clearly emerges.

All of this leads to a conclusion contrary to that reached by Dr. Landes. It is clear

that in the minds of both the networks and the advertisers, there is no close substitute for college football. The only programming which can compare to college football is professional football. Yet the two never compete because of the terms of the antitrust exemption granted by Congress to the National Football League. Dr. Landes' attempt to understate the great appeal of college football television is unpersuasive.

Finally, the Court notes that Dr. Landes does not include in any of his studies an analysis of the contracts between NCAA and ABC and CBS for the 1982 to 1985 seasons. The prices to be paid by the two networks in coming years seriously undercut Dr. Landes' conclusions. In 1981, ABC paid a minimum aggregate fee of $31 million for 24 exposures. In 1982, ABC and CBS have agreed to pay a total of $59 million for only 28 exposures. By 1985, the networks will pay $72 million for 28 exposures. There is no other network programming, with the possible exception of professional football, which could command such a dramatic price increase with so small an increase in output. Again, Dr. Landes' conclusions are seriously undermined and utterly unpersuasive.

The only other evidence presented by NCAA on the matter of relevant market was the testimony of Mr. Paul Klein, a former programming executive at NBC and an expert on the television industry. Like Dr. Landes, Mr. Klein is very knowledgeable of the matters to which he testified. However, like Dr. Landes, the conclusions he draws from the facts he presents do not hold up when closely scrutinized.

Mr. Klein testified that all other programming is substitutable for college football in the view of both the networks and their advertisers. He observed that if there were no college football on the networks, advertisers would simply buy commercial time on other programs as a substitute. But this observation hardly supports the conclusion that all other programming is freely substitutable.

The economist's term for substitutability or interchangeability of products is "cross-elasticity of demand." "An element for consideration as to cross-elasticity of demand between products is the responsiveness of the sales of one product to price changes of the other." *United States v. E.I. DuPont de Nemours & Co.*, 351 U.S. 377, 400, 76 S.Ct. 994, 1009, 100 L.Ed. 1264 (1956). Thus, for Mr. Klein to observe that advertisers would switch to other programming if there were no college football on television tells us nothing. The question is not whether buyers will substitute other products if a certain product disappears. If automobiles disappeared tomorrow, consumers might well substitute bicycles, yet no one would seriously argue that bicycles and automobiles compete in the same product market. Rather, the question is whether a rise in the price of college football television rights fees would cause the networks to substitute other programming. The evidence is clear that they would not.

A comparison between the minimum aggregate fee paid by ABC in 1981 and the fees which will be paid by ABC and CBS in the next four years shows that the network demand for other programming is not responsive to increases in the price of college football. In 1981, ABC paid $31 million for the right to telecast college football 24 times. The price per exposure was approximately $1.3 million. In 1982, ABC and CBS have agreed to pay $29.5 million for 14 exposures, an average of about $2.1 million per exposure. Thus, in a single year, the price to the networks of college football has increased by about 62% per exposure. The networks have each agreed to pay $36 million for 14 exposures in 1985, or almost $2.6 million per exposure, an 100% increase over the 1981 price.

It is also clear that the networks expect to charge a higher price for commercial time. In 1981, ABC was allowed to show 506 minutes of commercials during NCAA football telecasts. ABC paid approximately $61,300 per commercial minute under its

contract with NCAA. In 1982, the contracts allow 26 minutes of commercial time on each of the 14 exposures which each network will carry, or a total of 364 minutes per network. Each network has therefore agreed to approximately $81,000 per commercial minute, a 32% increase in a single year. The networks have agreed to pay $98,900 per commercial minute in 1985, or 61% more than the 1981 price. Assuming that the networks do not plan to lose money, these increases will be passed on to advertisers. By agreeing to these startling increases in price, it is clear that the networks believe that advertisers will pay these higher prices.

It can thus be said with reasonable certainty that if there were other programming which is freely substitutable for college football in the view of the networks and the advertisers, the dramatic price increases called for in the 1982 to 1985 contracts would cause both the networks and advertisers to substitute that other programming. The fact that they have not substituted other programming is a clear indication that college football does not compete with all other programming. Rather, this analysis indicates that college football television is truly a market unto itself, in the view of both the networks and the advertisers.

Mr. Klein also offered his opinion that college football does not have infinite appeal to the networks. He testified that if the price of college football should become too high, the networks will substitute other programming. Again, while this is undoubtedly true, it does little to resolve the issue. Any monopolist can raise prices so high as to destroy demand for the product. But this does not mean that other products are readily interchangeable. It simply means that a monopolist can ultimately destroy the market for its product by charging a price that is too high. The fact that NCAA has not destroyed the market for college football television proves nothing.

Therefore, the evidence presented by the defendant is unpersuasive. The plaintiffs have proved that live college football television is a unique product for which there is no ready substitute. In a sense, it is difficult to understand the tremendous appeal of college football to the networks and their advertisers. Certainly the color, pageantry and tradition of the sport, and the interest of alumni in the sport, are significant factors. Whatever the reason, it is clear that there is no substitute in the minds of the networks and advertisers. They pay an enormous cost to reach an audience which is small relative to prime time programming. The networks are willing to allow NCAA to substantially dictate the conditions under which they may televise college football. The networks may even be willing to lose money on college football in return for some intangible benefits they believe themselves to derive from merely being associated with the sport. It is clear that college football does not compete with other television programming in any real sense, that it is a market unto itself, and that it is the relevant market for determining whether NCAA exercises monopoly power.

Having so defined the relevant market, it is clear that NCAA exercises monopoly power. "When a product is controlled by one interest, without substitutes available, there is monopoly power." *United States v. E.I. DuPont de Nemours & Co.,* *supra,* at 394, 76 S.Ct. at 1006. In this case, NCAA controls all of regular season college football television. The amount of televised college football not involving NCAA members is negligible, if it exists at all. NCAA has the power to reduce output and fix prices in the relevant market. It has formed an insurmountable barrier to the entry of competitors into the market by prohibiting its members, under threat of sanctions, from televising their games other than pursuant to the NCAA controls. Indeed, NCAA makes no attempt to deny that if college football television is the relevant market, it is a monopolist. Therefore, the Court concludes that NCAA has monopolized the market of college football television, in violation of § 2 of the Sherman Act.

## D. *Relief under the Clayton Act*

■ When a violation of the Sherman Act has been established, injunctive relief is available under the Clayton Act "when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity." 15 U.S.C. § 26 (1980). The plaintiffs have met the prerequisites for relief by showing that NCAA has violated the Sherman Act; that they have suffered antitrust injury proximately caused by NCAA's antitrust activities; that they face a clear probability of future injury if an injunction does not issue.

■ Before turning to the specifics of the relief which will be granted, the Court first notes that NCAA has raised the defense of *in pari delicto* to the plaintiffs' claims. There is substantial doubt as to whether the defense can be raised at all in antitrust matters. *See Perma Life Mufflers v. International Parts Corp.,* 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968). The Court does not need to resolve this difficult question, because even if *in pari delicto* remains a viable defense, the facts of this case do not support the defense for several reasons.

First, it simply cannot be said that the alleged wrongful acts of the plaintiffs are in any way equal to the wrongful conduct of the defendant. There is no evidence to show that either Oklahoma or Georgia were protagonists in the creation of the NCAA college football television controls. While they have received substantial revenues under the NCAA controls of the past, it is likely that they would have realized even more revenue in the absence of the NCAA controls. Beginning in 1952, NCAA has expanded its control over football television to the point that its power is absolute. This expansion of territory has been accomplished at the expense of the rights of schools such as the plaintiffs, and often over their objection, particularly in recent years. The plaintiffs, along with a number of their CFA allies, have attempted to address these problems in the forums provided by NCAA. They have been thwarted at every turn by the NCAA membership, which took its direction from the NCAA administration. NCAA is clearly the bad actor in this situation. Whatever wrongs the plaintiffs may have committed, they are overshadowed by the scope of the illegal actions taken by NCAA itself.

Second, the fact that the plaintiffs are currently making agreements with the networks pursuant to the challenged contracts does not provide grounds for the *in pari delicto* defense. This case provides a classic example of the "economic coercion" and "business necessity" exceptions to *in pari delicto*. *See Thomas v. City of Richmond,* 79 U.S. (12 Wall.) 349, 355, 12 L.Ed. 453 (1870); *Ring v. Spina,* 148 F.2d 647 (2d Cir. 1945). When the plaintiffs and CFA attempted to withdraw from the NCAA's football plan, they were met with a campaign of veiled threats and coercion. These activities ceased only after the Court ordered that they cease. However, the damage had already been done. The NCAA threats hung like a shroud over the deliberations of CFA members as to whether to join in the NBC contract. The threats of NCAA sanctions, not only against the football programs but against all sports, were clearly intended to, and achieved the ultimate effect of, coercing the plaintiffs and others into continued participation in the NCAA cartel.

Similarly, the plaintiffs must make their agreements with ABC, TBS and CBS as a matter of business necessity. Since retributive measures would most certainly be taken by NCAA if the plaintiffs went to a network other than those with which NCAA has contracted, the plaintiffs must sell to these networks pursuant to the NCAA contracts or face a season without football television revenues. These revenues can constitute millions of dollars in any given year, and the loss of these revenues would be a severe blow to the athletic

programs run by the plaintiffs. In order to maintain their athletic programs, it is absolutely necessary that they continue to participate in the NCAA cartel. Therefore, this case falls into the "economic coercion" and "business necessity" exceptions to the *in pari delicto* doctrine.

Finally, the Court believes that the defense of *in pari delicto* has no application where, as here, the plaintiffs seek only equitable relief in the form of an injunction against continuation of the illegal scheme. As a matter of antitrust policy and as a matter of fundamental fairness, the doctrine simply should not be applied in cases such as this one.

> [C]ourts must recognize the need both to promote free and open competition and to prevent a wrongdoer from benefiting from his own misconduct. This can be accomplished by . . . allowing the *in pari delicto* defense to bar treble damage actions by plaintiffs within its ambit. Courts should not, however, allow the defense to preclude suits for injunctive relief against a defendant's continued wrongdoing if the plaintiff has ceased voluntarily to participate in the challenged arrangement. It is one thing to bar a plaintiff's damage recovery because the law does not reward wrongdoers for their own voluntary wrongdoings. It is entirely another . . . to deny the plaintiff a right to bring the illegal scheme to an end.

Handler and Sacks, *The Continued Vitality of In Pari Delicto as an Antitrust Defense,* 70 Georgetown L.J. 1123, 1152 (1982).

The plaintiffs are not voluntary members of the NCAA cartel. It would do extreme violence to the policies of the antitrust laws to allow a wrongdoer to interpose *in pari delicto* as a defense where the plaintiffs seek only equitable relief. The Court is convinced that where a participant in an illegal scheme either has withdrawn or is subject to sanctions from the other participants for seeking to withdraw, *in pari delicto* has no application. L. Sullivan, *Anti-*

*trust* § 250 at 784–785 (1977). In this case, the plaintiffs faced the choice of continued participation in the NCAA cartel, or the financial devastation of their athletic programs and the accompanying deleterious effects on the students they serve. It would be unjust to bar their claims under the doctrine of *in pari delicto,* and it would make folly of Congress' antitrust policy. The Court declines to bar the plaintiffs' claims under this doctrine.

The only remaining issues as to the plaintiffs' right to injunctive relief are those traditionally considered by courts of equity. In this case, the traditional bases of equitable jurisdiction are present. The plaintiffs have no adequate remedy at law. The only remedy available is damages, but because NCAA has controlled the market so thoroughly, the plaintiffs could never prove with the requisite reasonable certainty the damages they have suffered. Moreover, even if damages could be proved, the plaintiffs would have to file a lawsuit every year to recoup the profits they lost the previous year due to the NCAA controls. Equity abhors a multiplicity of suits. It is clear, therefore, that there is no adequate remedy at law.

The Court is required to balance the equities between the parties in deciding whether to grant injunctive relief. In this case, the balance overwhelmingly favors the plaintiffs.

NCAA argues as to this issue that the fact that its television controls were adopted by an overwhelming majority vote of the membership should sway the scale in NCAA's favor. However, the Court has previously discussed the fact that the vast majority of NCAA members suffer none of the restrictions of the NCAA controls. Meanwhile, they do receive a substantial indirect benefit in that NCAA receives a large amount of revenue from the network contracts, which would otherwise not be available. This majority therefore has everything to gain and nothing to lose un-

der the plan. It can hardly be said that this majority has acted in an equitable manner. Indeed, the intransigence of the NCAA administration and its allies in the membership persuades the Court that injunctive relief should be granted.

NCAA also argues that the plaintiffs are mere surrogates of CFA, and that Georgia President Davison, a former officer of CFA, has brought this action to avenge the failure of the CFA–NBC contract. However, the Court finds no merit in this argument. The Court would note that the CFA–NBC contract failed in large part due to the campaign of veiled threats against CFA members conducted by NCAA. Had NCAA allowed the CFA–NBC contract to be judged on its merits by CFA members, this litigation might never have occurred. The Court would also note that Dr. Davison made clear to CFA as well as NCAA that it had no right to make a television contract on behalf of Georgia without his express permission. Dr. Davison's efforts to protect the rights of his institution have been consistent throughout this controversy, and the Court finds nothing in his acts, or those of CFA, which could be called inequitable.

■ NCAA next urges that the controls have been in effect for thirty years, that each of the plaintiffs has received the full financial benefits of those controls, and that it is inequitable for the plaintiffs to challenge the controls at this late date. Again, the NCAA's argument is without merit. Both of the plaintiffs have long been prominent football schools. It is likely that they have suffered a tremendous loss of revenue over these thirty years as a proximate result of the NCAA controls. The fact that they have suffered this injury for so long indicates benevolence rather than malevolence on their part. They have attempted to seek redress in the forums provided by NCAA, but have been thwarted by a majority which suffers none of the restrictions they have imposed on the plaintiffs. There is nothing inequitable about the plaintiffs' conduct to date. On the contrary, it is clear that NCAA is the wrongdoer. NCAA has commandeered the plaintiffs' rights to sell their football games. NCAA has seized monopoly power by fiat, and has maintained that power by means of threats and coercion. The equities clearly favor the plaintiffs, and the Court will grant them the relief which they seek.

■ The Court has carefully considered the scope of the relief which should be granted. It is clear that the plaintiffs are entitled to a declaratory judgment affirming the fact that the right to sell their football games for telecast is a property right belonging to the plaintiffs themselves. NCAA has no such right. NCAA does nothing to assist in the staging of a game by an institution. It pays none of the costs of the event, and bears none of the risk that the event will cost more in expenditures than it will generate in income. It should not require a judicial decree to affirm the property rights of the plaintiffs, but the presumptuous seizure of these rights by NCAA makes such a decree necessary and appropriate.

■ It is also necessary, in order to accord full relief, to declare the contracts which NCAA has entered into with ABC, CBS and TBS to be illegal and therefore void and unenforceable. These contracts and their predecessors are the means by which NCAA has fixed prices, reduced output and monopolized the market. They are the source of threatened antitrust injury to the plaintiffs. They simply cannot be allowed to stand.

In furtherance of this declaration, it is necessary to enjoin NCAA from committing certain acts. NCAA shall be enjoined from attempting to enforce the provisions of the network contracts against both NCAA members and the networks. NCAA shall also be enjoined from acting as the exclusive agent for the sale of telecasting rights to the football games of member institutions, and from requiring as a condition of membership that member institutions grant

to NCAA the right to control their telecasting rights. Each of these activities shall be prohibited forthwith.

The Court is well aware that the network schedules have been established for the 1982 college football season, and that many schools have executed contracts with ABC, CBS and TBS. The Court is also aware that, in many instances, the institutions involved have made expensive arrangements for changing the date or time of a game in order for it to be televised. However, several factors lead the Court to conclude that the injunction here described should take effect immediately.

First, it would be unseemly for the Court, having found an overt violation of the antitrust laws, to allow the violation to continue for even a single day, let alone for the rest of the current season. Such a course would imply that justice is timid, when it is not. The Court's actions must be swift and thorough in breaking up this combination which restrains trade, and they must leave no room for doubt as to the Court's intention to bring college football television into compliance with the Sherman Act.

■ Second, the Court finds that it is inimical to the policy of the antitrust laws to allow NCAA yet another year of ill-gained profit under the network contracts. NCAA is scheduled to receive between five and six million dollars from the networks this year. They would receive this money only because they have fixed prices, reduced output and monopolized the market. It is unthinkable, in the view of the Court, to allow NCAA any further profit from its anti-competitive activities. The Court is aware of NCAA's dependence on these revenues, and the purposes to which they are put. Nonetheless, to allow NCAA to continue to profit from its wrongdoing would only aggravate a bad situation. Violators of the antitrust laws should not be allowed to retain the benefits of their wrongful acts. *Schine Chain Theatres, Inc. v. United States,* 334 U.S. 110, 128, 68 S.Ct. 947, 957, 92 L.Ed. 1245 (1978).

■ Therefore, NCAA shall be enjoined not only from attempting to enforce the contracts now in effect, but also from making any future contracts which purport to grant any telecaster the right to televise the football games of member institutions. NCAA shall also be enjoined from requiring as a condition of membership that an institution grant NCAA the power to sell its television rights. Both the contracts and the condition of membership are essential to NCAA's antitrust scheme, and the Court must therefore render them inoperative. The Court must also act to prevent any future illegal contracts. While NCAA protests that there is no need to prohibit future contracts, "[w]hen the purpose to restrain trade appears from a clear violation of law, it is not necessary that all of the untravelled roads to that end be left open and that only the worn one be closed." *International Salt Co. v. United States,* 332 U.S. 392, 400, 68 S.Ct. 12, 17, 92 L.Ed. 20 (1947). NCAA has acted with the clear purpose of restraining trade. By forbidding NCAA to contract on behalf of its members, the Court forecloses the possibility that NCAA will accomplish its anticompetitive purpose by means of more subtle contractual provisions in the future.

■ NCAA insists that it will cease all illegal conduct and that an injunction is therefore unnecessary. However, "there [is] nothing indicating that this clear violation of the antitrust laws [has] terminated or that the threat to [the plaintiffs] inherent in the conduct [will] cease in the foreseeable future. Neither the relative quiescence of the [defendant] during the litigation nor claims that objectionable conduct [will] cease with the judgment [negates] the threat to [the plaintiffs]." *Zenith Radio Corp. v. Hazeltine Research, Inc., supra,* 395 U.S. at 131, 89 S.Ct. at 1580. The Court cannot accept NCAA's claim that it will voluntarily abandon its antitrust activities. NCAA has long been aware of the antitrust implications of its football television controls, and yet its most recent activities only

prolong through at least 1985 the most pernicious aspects of the controls. It is clear that the Court must act, because NCAA cannot be expected to conform its conduct to the law in the absence of an order of the Court. Having found a violation of the Sherman Act, the Court is duty-bound to "render impotent the monopoly power which violates the Act." *Schine Chain Theatres v. United States, supra,* 334 U.S. at 129, 68 S.Ct. at 957.

Finally, the Court will, in its discretion, retain continuing jurisdiction in this matter. The injunction which will issue may well lead to circumstances which cannot at this time be foreseen. It is therefore appropriate for the Court to retain jurisdiction for the purposes of monitoring compliance with this injunction and modifying or expanding the relief granted to meet the circumstances which result from the Court's decision in this matter.

It is regrettable that an organization such as NCAA, which has served many useful purposes over the years, should be found to be in violation of the laws of the United States. The Court would only observe that the wound which has today been suffered by NCAA is a self-inflicted wound. NCAA has strayed far from the purposes for which it was organized. The Court does not know and need not determine whether the NCAA administration, in formulating the controls at issue, was motivated by genuine concern for NCAA members, by a lust for power, or by rank greed. What is clear is that NCAA has violated the antitrust laws, and that the Court's duty is to restore competition to this monopolized industry.

It is the Court's fond hope and genuine belief that the result of this litigation will be an open and competitive market which will ultimately serve the best interests of the football-playing colleges, the telecasters, television advertisers and, most importantly, the viewers of college football television. Congress has determined that free competition will yield this result and that therefore competition shall be the rule of commerce in our nation. By its decision today, the Court gives effect to that rule.